Henri and Mary TATRO et al., Plaintiffs,

v.

STATE OF TEXAS et al., Defendants.

Civ. A. No. CA3–79–1281–G.

United States District Court,
N. D. Texas,
Dallas Division.

May 26, 1981.

Moseley, Jones, Enoch & Martin by Craig T. Enoch, Dallas, Tex., for plaintiffs.

Donald P. Wilcox, Michael G. Young, Austin, Tex. and Thompson & Knight, Dallas, Tex., for amicus curiae.

O. Glenn Weaver, Irving, Tex., for J. F. Townley.

Mark White, Atty. Gen. of Texas, Martha H. Allan, Asst. Atty. Gen., Austin, Tex., for State of Texas and Texas Ed. Agency.

Deatherage & Weaver by James W. Deatherage, Irving, Tex., for Irving ISD, Bd. of Trustees of Irving ISD, Roger Hill, Dr. Robert Pierce, Anne Pfaff, Barbara Cardwell, Troy Kelley, Pat Norman and John Stipes.

## MEMORANDUM OPINION

PATRICK E. HIGGINBOTHAM, District Judge.

Amber Tatro is a five year old female suffering from myelomenengocele, commonly known as spinal bifida.[1] As a result

---

[1]. In accordance with the Court of Appeals' Order of Remand in *Tatro v. Texas*, 625 F.2d 557 (5th Cir. 1980), this court has tried this case. This opinion sets forth the court's findings of fact and conclusions of law. The general nature of this suit has been described both at 481 F.Supp. 1224 (N.D.Tex.1979) and 625 F.2d 557 (5th Cir. 1980).

The parties stipulated in the Pre-Trial Order that the preparation, materials and procedure for performing CIC on females is generally as follows:

(1) Equipment and Materials:
  (a) Clean catheter in size prescribed by treating physician;
  (b) Catheter carrying containers;
  (c) Catheter extension when patient is in a wheelchair;
  (d) Clear plastic liquid detergent container with a hanger when patient is in a wheelchair;
  (e) Soap and water;
  (f) Container for catching the urine;
  (g) Table or desk on which to place the child;
  (h) Large underpad to prevent soaking of liners or other table covering; and
  (i) Water soluble lubricant.
(2) Preparation and Procedure:
  (a) Get all the equipment and materials ready.
  (b) Wash hands with soap and water.
  (c) Get the child ready and place her on her back on the table or desk (CIC is easier to perform at table or desk height).
  (d) Spread labia apart with one hand and wash genitalia with soap and water with the other hand, always moving in a downward direction (never working in an upward direction since doing so will move germs from around the rectum up into the area of the bladder opening).
  (e) Hold the catheter one inch from the tip and insert it into the urethra until the urine flows.
  (f) Hold the catheter in place until the urine stops draining, then push the catheter in another inch or so to be sure the bladder is completely emptied.

of this birth defect, Amber suffers from orthopedic and speech impediments and a neurogenic bladder. Because of her bladder condition, Amber is unable to void voluntarily, and must be catheterized several times each day. The method of choice is Clean Intermittent Catheterization ("CIC").

In early 1979 Mary Tatro, Amber's mother, asked the Irving Independant School District ("school district") to provide Amber with special education. After testing Amber, the school district developed an Individual Education Program ("IEP") which it believed would provide Amber with the necessary educational and therapeutic services. Amber then was recommended for placement in the school district's Early Childhood Development Classes beginning September, 1979. The school district, however, maintained that it had no obligation to provide CIC.

In June of 1979, Amber's parents appealed to an Impartial Due Process Hearing Officer the school district's decision not to provide CIC. They did not otherwise question the appropriateness of the IEP. The Hearing Officer found the school district to be obligated to furnish CIC, and recommended that Amber's IEP be modified accordingly. This decision was appealed to and affirmed by the State Commissioner of Education. The school district then appealed to the State Board of Education, which reversed the Commissioner.

On October 12, 1979, the Tatros brought this action seeking an injunction ordering defendants [2] to provide Amber with CIC and to recover compensatory damages and attorneys' fees.

In its Memorandum Opinion filed December 21, 1979, 481 F.Supp. 1224, this court, relying upon a written stipulation of facts believed to have been agreed to by the Tatros and the District, held that neither the Education of All Handicapped Children Act ("EAHCA"), 20 U.S.C. § 1401 *et seq.*, nor the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, requires the school district to provide Amber with CIC. After the December 21, 1979 Order, the school district advised the Court of Appeals, but not this court, that it had not actually signed the filed written stipulation. On September 2, 1980, the Court of Appeals vacated that ruling, and held that the school district was obligated under both the EAHCA and § 504 of the Rehabilitation Act to furnish CIC. 625 F.2d 557. In remanding for further proceedings, the Court of Appeals recognized that there was no factual record upon which to base an opinion, but nonetheless proceeded to address the merits of the case. The court then directed this court to make appropriate findings to determine whether plaintiffs are entitled to relief under either statute as construed by it. 625 F.2d at 558 n.1.

(g) Remove the catheter slowly, stopping any time urine flows so as to empty the bladder completely. When the catheter is ready to come out, hold the catheter tip up so that the urine will drain down from the tip of the catheter and not on you.

(h) After noting and recording the amount of urine obtained, its appearance for any abnormality, discard the urine.

(i) Clean the catheter with soap and water, allow it to dry and place it in a clean, dry envelope. At least once a day after the catheter has been washed with soap and water, place it in a pot of water and boil for 20 minutes. Allow it to air dry and place it in a clean dry envelope.

(j) Catheterize at prescribed intervals so that there is never more than 5 ounces (150cc) of urine in the bladder at any one time for a female child of one to five years of age.

(k) Keep a daily record of the time of catheterization, the amount of urine obtained, and if the child is wet, damp or dry.

(*l*) Do not crede the bladder as it may push urine back into the kidneys.

2. As of the Amended Complaint of November 8, 1979, the defendants are the State of Texas, the Texas Education Agency, Alton Bowen (the Commissioner of Education), the State Board of Education, the individual members of the Board of Education, the school district, the Board of Trustees for the school district, the individual members of the Board of Trustees, and J. F. Townley, individually, as superintendent of the school district. Although it is unclear from the pleading, plaintiffs indicated at the hearing that the named individuals are sued in their individual capacity. Townley was dismissed from this action by Order of December 21, 1979.

Applying the Act as interpreted by the Court of Appeals, on January 16, 1981, this court issued an Interim Order directing the school district to provide Amber with such CIC as necessary to her IEP. Amber was enrolled with the school district on January 19th, and until January 23rd, the school district provided CIC. During that week a dispute between the school district and Mary Tatro developed concerning the adequacy of a parental consent form with attached physician's prescription submitted by Mary Tatro to the school district. Believing the consent inadequate and that it was not required under the Interim Order to furnish CIC without a valid consent form, the school district discontinued CIC on January 26th. Amber, however, continued to attend her classes, with CIC provided by her babysitter as necessary. On March 13, 1981, the Tatros questioned the school district decision by filing a motion for sanctions. At the hearing on the motion, a consent form and physician's prescription acceptable to both the Tatros and the school district was agreed upon. With this collateral dispute resolved, the school district resumed CIC on April 1, 1981 (after spring vacation). A final hearing was held on April 23, 1981, to allow the Tatros to offer additional evidence as to damages and to supplement their request for attorneys' fees. At this hearing, the court denied the motion for sanctions because it found that the school district had acted properly, and within the spirit of the Interim Order.

At the outset, it is important to place the school district's refusal in perspective. At no time has the school district refused to place Amber in its Early Childhood Development Classes. Instead, the school district urged Amber's parents to enroll her in the program and make private arrangements for CIC pending the final disposition of the legal dispute.[3] Despite the benefits of placing Amber in the program, her parents chose to forego such an arrangement, and instead kept Amber at the Helping Hand Development Center[4] for an additional year. Amber's parents did not attempt to enroll Amber with the school district for the 1980/81 school year.[5]

*The State Defendants*

In its Memorandum Opinion of December 31, 1980, this court dismissed any claims for retrospective relief against the State defendants (the State of Texas, the Texas' Education Agency and the State Board of Education) on the basis of their 11th Amendment immunity.[6] *See Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Because the State Board of Education has supervisory responsibility for assuring that Amber is educated in accordance with the EAHCA, *see* 20 U.S.C. § 1412(6); *S-1 v. Turlington*, 635 F.2d 342, 350 (5th Cir. 1981); *Kruelle v. New Castle County School Dist.*, 642 F.2d 687 (3rd Cir. 1981), the members of the State Board of Education will be retained in their official capacities for the purpose of injunctive relief. Plaintiffs joined the State Commissioner of Education in his capacity as "director" of the Texas Education Agency.

3. Although Amber's parents apparently expressed an initial preference for a full day rather than the half day program in which Amber would have been enrolled, the only aspect of the IEP raised at the administrative proceedings or before this court was the school district's unwillingness to furnish CIC.

4. The Center provides therapeutic services for the mentally and physically handicapped. It does not offer educational services. From September through December, 1980, Amber was enrolled at the Special World Day Care Center, where she received kindergarten classes. While there, she was transported to the Helping Hand Development Center several times each week for physical therapy.

5. By letter of September 9, 1980, and again, by letter of October 21, 1980, the school district requested permission to reevaluate Amber so as to update her IEP. Mary Tatro, in a letter dated November 20, 1980, informed the school district that she believed a new assessment to be inappropriate, but agreed to allow Scottish Rite Hospital to provide the school district with some information.

6. Such immunity also applies to Commissioner Bowen and the members of the State Board of Education to the extent they are sued in their official capacity.

Because the members of the Board of Education are the proper parties for injunctive relief, the Commissioner is DISMISSED in his official capacity. The State of Texas and the Texas Education Agency are DISMISSED. *See Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3058, 57 L.Ed.2d 1114 (1978).

### Commissioner Bowen and the Members of the State Board of Education

There is no prospective relief to which plaintiffs are entitled against Commissioner Bowen or the members of the State Board of Education in their individual capacities.

■ State officials sued in their individual capacities do not, of course, share their State's 11th Amendment immunity. They, however, are entitled to a qualified good-faith immunity, provided such defense is properly pled. *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); [7] *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).

■ The record is bereft of any evidence that Commissioner Bowen or any member of the State Board of Education acted with anything but good-faith. There is no evidence that they intentionally attempted to violate plaintiffs' rights or acted with malice toward plaintiffs. In that the Board's decision that CIC is not a "related service" [8] was affirmed by a federal district court, it cannot be found that its members knew or reasonably should have known that such is not the case.

Having pled the good-faith defense, there being no evidence that they acted in any other manner, and the uncertainty of the law providing affirmative evidence of good-

faith, Commissioner Bowen and the individual members of the State Board of Education are DISMISSED.

### The Members of the Board of Trustees

Plaintiffs also have joined the individual members of the Board of Trustees of the school district. In that there is no equitable relief to which plaintiffs are entitled against the individual Trustees, plaintiffs' sole basis for the Trustees' presence in their individual capacities is that they may be liable for compensatory damages.

Plaintiffs have advanced one argument for why the Trustees are not entitled to the *Wood v. Strickland* qualified good-faith immunity. Plaintiffs contend that as a result of a Department of Health, Education and Welfare letter of September 27, 1979, the Trustees knew or should have known that they were violating plaintiffs' rights. That letter informed the superintendent of the school district that the Office for Civil Rights had concluded from its investigation that the school district was violating § 504 by not providing CIC. It should be noted, however, that the letter was sent almost three weeks after the school district's decision had been affirmed by the State Board of Education.[9]

There is no evidence that the Trustees acted with malice or intentionally attempted to deprive plaintiffs of their rights. The President of the Board of Trustees testified that it was the belief of the Board that the school district was not legally obligated to provide CIC. He further testified that the Board was concerned that CIC is a medical practice, and, therefore, cannot be performed lawfully by employees of the school district. *See* pages 975–976, *infra.*

---

7. In *Wood* the Court recognized a qualified good-faith immunity from liability for damages under § 1983. The Court found that there was no basis for believing that Congress intended to eliminate the traditional common law good-faith immunity available to school officials. 420 U.S. at 318–22, 95 S.Ct. at 999–1001. Even assuming that damages are available under the EAHCA or § 504, there is no basis for believing that Congress intended to abrogate that good-faith immunity through either statute.

8. Commissioner Bowen affirmed the Hearing Officer's finding that CIC is a "related service." Plaintiffs have never clarified why this decision should subject the Commissioner to personal liability for compensatory damages.

9. HEW's conclusion that the school district was violating § 504 was based, in part, on the finding that CIC is a "related service," as defined by 45 C.F.R. § 121a.13. The Board of Education previously had ruled that CIC is not a "related service."

If for no other reason, because the Board of Trustee's construction of applicable federal law was upheld by the State Board of Education, and, later, by this court, the members of the Board of Trustees are not deprived of their qualified good-faith immunity by the HEW letter. Although the Board's belief as to its duty to furnish CIC has to date proved to be an incorrect assessment of the law, it was not an unreasonable conclusion. *See Wood v. Strickland, supra,* 420 U.S. at 321–22, 95 S.Ct. at 1000–1001.[10] The members of the Board of Trustees are DISMISSED in their individual capacities.

### The EAHCA

In its 1979 Memorandum Order, this court held that CIC is not a "related service" within the meaning of 20 U.S.C. § 1401(17) and that the EAHCA, therefore, does not require the school district to furnish CIC. Defendants argued that CIC is a medical service, and thus not covered by the Act. Under this court's view it was unnecessary to reach this definitional issue. This court found that Congress had not intended "related services" to sweep so broadly as to include services which do not "arise from the effort to educate." The Court of Appeals disagreed with that construction. The school district now returns to its earlier argument that CIC is an exempt medical service. This court will first describe CIC and then turn to its proper classification under the EAHCA.

Despite its present widespread use, CIC has become an accepted procedure only in recent years. Before CIC became an accepted practice, a substantial number of physicians believed that penetration of the urethra ought to be done only in a sterile environment with sterile instruments. The only alternative entailed exerting manual pressure upon the bladder. This pressure technique, however, presented a risk of reflux of fluid and injury to the kidneys. CIC is a far more simple procedure. The catheter need not be sterile nor must its use be confined to a sterile environment. Obviously, CIC requires relatively less direct medical superintendence than this earlier used method.

There is dispute about when Amber must be catheterized each day. The parties stipulated that Amber must be catheterized approximately four times a day, but the stipulation does not further address when it is needed despite the fact that her need for catheterization on any given day largely is a function of her fluid intake. Because Amber has no sensation of bladder fullness, she is dependent upon a routinized schedule of catheterization to insure proper voiding.[11] The evidence indicates that CIC performed approximately every three to four hours is sufficient to prevent injury to Amber's health. The appropriate schedule may vary, however, as Amber continues to mature.

In sum, CIC has become a relatively simple procedure that can be taught in less than an hour. Amber has been catheterized by her parents, her babysitter, her teachers and teachers' aides at the Helping Hand Development Center, and her teenage brother. In a few years, Amber should be able to catheterize herself.

### EAHCA

The EAHCA does not define medical services, except to provide that only medical services for diagnostic and evaluation purposes are related services. 20 U.S.C. § 1401(17). The implementing regulations shed a little more light. They define medical services as "services provided by a licensed physician to determine a child's medically related handicapping condition which results in the child's need for special

---

**10.** The Court in *Wood* was concerned that ignorance not be used as a basis for immunizing violations of "clearly established constitutional rights." The obligation of a school district to furnish CIC hardly can be considered a settled question of law. As noted in *Wood,* school board members cannot be "charged with pre-

dicting the future course of [the] law." 420 U.S. at 322, 95 S.Ct. at 1000.

**11.** *Improper voiding may result in reflux, a condition in which urine backs up in the kidneys.*

education and related services." 45 C.F.R. § 121a.13(b)(4). The regulations further provide that "school health services" are related services, and, by implication, not exempt medical services. *Id.* § 121a.13(a). "School health services" are defined as "services provided by a qualified school nurse or other qualified person." *Id.* § 121a.13(b)(10). The statute and its implementing regulations suggest that medical services are services that can be provided lawfully only by a licensed physician. But they give no direct guidance as to precisely what "provided by a licensed physician" means.

The school district argues that all services that must be performed under the control and supervision of a licensed physician are "provided by a licensed physician." Plaintiffs' response seems to be that the appropriate test is not one of control and supervision, but whether CIC must be performed only in the presence of a physician.

### Texas Law

■ This court is here construing an act of Congress of nationwide application. And it ought to be given a uniform construction. Yet Congress, by defining the Act's reach by definitions locatable only in the law of the respective States, perforce intended, at least to this extent, that its construction be parochial. A contrary view would require a finding that Congress intended to alter patient-doctor relations in the several States. Stating the proposition answers it. The types of medical treatment that can be performed by nonphysicians, and the extent to which any treatment must be under the control and supervision of a licensed physician, are regulated by State law. And the courts must look to State law to determine whether a service is a medical service. To

the extent of the accommodation of varying practices, the Act tolerates non-uniform application. A given service, therefore, may be a related service in one State and an exempt medical service in another.[12] This court turns now to the law of Texas.

The school district contends that under the Texas Medical Practice Act, *Tex.Rev. Civ.Stat.Ann.*, art. 4495, *et seq.* (Vernon 1976), its employees can provide CIC only if they are under the control and supervision of a licensed physician. To furnish CIC without such direction, it argues, would be to engage in the unlawful practice of medicine. *Id.*, arts. 4510, 4510a & 4510b. Yet, to require it to retain a physician to control and supervise the provision of CIC would convert CIC into a medical service it is not required to furnish.

This court has been forced to inquire into the legal responsibility of Texas physicians to control and supervise prescribed treatment, a subject that has received little judicial attention. The task includes fitting together a three party relationship: the school district, the child and the child's doctor. The interest and concern of the medical profession is plain. At a practical level it makes little sense to require school districts to provide a service that cannot be provided without a prescription if physicians will not write them for fear of running afoul of their own Practice Act and the demands of their malpractice insurance carriers. For these reasons, this court invited the Texas Medical Association and the Dallas County Medical Society to participate as amicus curiae. The medical societies submitted a joint brief stating their view of the Texas Medical Practice Act.[12A]

■ The parties agree that the school district cannot provide CIC without a valid medical prescription. To do so would con-

---

**12.** That State law must determine who can provide a service is recognized by the commentary following § 121a.13, which states:

There are certain kinds of services which might be provided by persons from varying professional backgrounds and with a variety of operational titles, depending upon requirements in individual States. For example, counseling services might be provided by so-

cial workers, psychologists, or guidance counselors; and psychological testing might be done by qualified psychological examiners, psychometrists, or psychologists, depending upon State standards.

**12A.** For the aid of treating physicians, their brief is attached as an appendix to this Opinion.

stitute the practice of medicine in violation of Article 4510b. A physician, however, may prescribe treatment to be performed by another individual or an institution if he believes that individual or institution capable of providing the prescribed service in a competent manner. Such treatment by the delegate does not constitute the unlawful practice of medicine. *See Thompson v. Texas State Board of Medical Examiners,* 570 S.W.2d 123, 129–30 (Tex.Civ.App.—Tyler 1978, writ ref'd n. r. e.). Nor is the physician obligated to supervise directly the treatment he has prescribed; his duty is to ascertain that the person or institution providing the treatment in conformity with his prescription is adequately qualified.

This construction is consistent with the Texas Nursing Practice Act, *Tex.Rev.Civ. Stat.Ann.* art. 4513 *et seq.* (Vernon 1976). Article 4518(5) of that Act defines professional nursing "as the performance for compensation of any nursing act ... in the administration of medications or treatments as prescribed by a licensed physician." *Id.* (Vernon Supp.1980–81). Providing such treatment is a nursing act, and, therefore, not unlawful practice of medicine whether or not the nurse is under the direct supervision and control of the prescribing physician. *See Op.Tex.Atty.Gen.* No. H–1295 (Dec. 28, 1978) ("Professional nurses may also administer medications and treatments on a physician's prescription ... without any statutory requirement of direct supervision by the physician.")

A physician thus may prescribe CIC to be furnished by a school district if he believes that the district has personnel qualified to perform CIC.[13] The school district retains professional nurses. CIC has been prescribed for Amber by a licensed physician, and a proper prescription for such treatment now has been submitted to the school district. Moreover, the parties concede that with only minimal additional training a professional nurse should be more than capable of performing CIC. In sum, the court is persuaded that furnishing CIC does not constitute the unlawful practice of medicine when performed by professional nurses in accordance with a valid medical prescription. *See Tex.Rev.Civ.Stat. Ann.* art. 4510b (Vernon 1976).[14] Because services that can be provided by qualified school nurses are "school health services," and, therefore, "related services," *see* page 975, *supra,* CIC is not an exempt "medical service" within the meaning of the EAHCA.[15]

The school district contends that even if CIC is not a medical service, it is not a

---

**13.** It follows that a school district must secure the services of persons sufficiently trained to allow a treating physician to prescribe with a view toward prescription implementation by the school.

**14.** This court does not hold that CIC can only be performed lawfully by professional nurses. Lay persons, with proper medical training, may, in accordance with a valid prescription, provide treatment that without such training and prescription would be considered unlawful *practice of medicine.* Plaintiffs have presented testimony that Scottish Rite Hospital will provide to school district employees free instruction in CIC. Provided the physician has ascertained that such training is sufficient to qualify a person to perform CIC, he can prescribe CIC to be furnished by a school district through its professional nurses *or* those non-nursing employees who have received such training.

**15.** It is unclear whether a physician is liable for independent acts of negligence of school district employees performing services in conformity with his prescription. In *Sparger v. Worley Hospital, Inc.,* 547 S.W.2d 582 (Tex. 1977), the Texas Supreme Court rejected the "captain of the ship" doctrine in favor of the "borrowed servant" doctrine. Arguably, under *Sparger,* the prescribing physician would not be liable for independent acts of negligence by school district employees as long as he exercised ordinary care in prescribing that the treatment be performed by school district personnel. But, to the extent that a physician controls, supervises, or instructs unlicensed persons providing nursing care, he may be liable for their acts. *See Op.Tex.Atty.Gen.* No. MW–318, at 1016–17 (April 1, 1981). Although the Attorney General takes a somewhat narrower view, *see id.,* on the facts of *Sparger,* it does not appear that a prescribing physician exercising ordinary care would be liable for the school district's negligence simply because he prescribed the treatment. But the question has not been dispositively resolved by the Texas courts.

related service in her case because it is not "required to assist a handicapped child to benefit from special education." 20 U.S.C. § 1401(17). Specifically, they argue that Amber can attend the school district's Early Childhood Development Classes without CIC during her hours of attendance.

The majority of five-year olds in the school district attend a half-day program, and only a few attend more than half-day. Upon recommendations of the district's Co-ordinator for Early Childhood Training, Amber has been placed in the half-day program which lasts two hours and forty-five minutes. While there was no evidence as to the exact time needed to bus Amber to school, its range is approximately fifteen to thirty minutes each way. Assuming the maximum thirty minutes, Amber will be under the school district's supervision for almost four hours each school day.

This court finds that Amber will require catheterization during her school hours if she is to attend the school district's half-day program. The medical evidence presented at trial establishes that while it cannot be determined definitively whether a daily interval of four hours between catheterizations will injure Amber, it does present a risk of serious injury. Amber is not required to accept such a risk in order to attend school. Under the EAHCA, Amber is entitled to have her IEP modified to have the school district furnish CIC. Without such a modification, Amber's IEP fails to provide a "related service" that is "required to assist [Amber] to benefit from special education." 20 U.S.C. § 1401(17).

For the stated reasons, the school district is ordered to modify Amber's IEP to pro-vide for CIC as prescribed by her personal physician.[16] In this regard, this court finds that plaintiffs will suffer irreparable harm if such prospective relief is withheld, that the cost to defendants from such an order is minimal, and that the public interest is served by ensuring that Amber receives a free appropriate public education.[17]

### § 504

Because plaintiffs' recovery of counsel fees may ultimately turn on whether a violation of § 504 has been proved, that statute is discussed in that context. *See* pages 984–986, *infra*.

### Damages

The Tatros seek damages for expenses incurred in sending Amber to the Helping Hand Development Center and the Special World Day Care Center, and an additional award of $50,000 for the violation of Amber's rights.

The federal district courts have split on whether the EAHCA provides a private right of action for damages. *Compare Monahan v. Nebraska*, 491 F.Supp. 1074, 1075, 1094 (D.Neb.1980), *aff'd in part vacated in part*, 645 F.2d 592 (8th Cir., 1981) *and Boxall v. Sequoia Union High School District*, 464 F.Supp. 1104, 1112 (N.D.Cal.1979) *with Miener v. Missouri*, 498 F.Supp. 944, 949 (E.D.Mo.1980) *and Anderson v. Thompson*, 495 F.Supp. 1256, 1269 (E.D.Wis.1980) *and Loughran v. Flanders*, 470 F.Supp. 110, 113–15 (D.Conn.1979). The Act provides that the reviewing court may grant such relief as it determines to be appropriate. 20 U.S.C. § 1415(e)(2). Reimbursement for substitute educational services is consistent with the congressional purpose that handi-

16. Although this court uses the term "personal physician" in its Order, any physician treating Amber regularly may prescribe CIC. It also is not necessary that the prescribed treatment be identical to the procedures set out in the pretrial order, *see* note 1 *supra*, so long as they are prescribed by a licensed physician. Throughout this dispute, one of the school district's stated concerns has been that it not be required to exercise medical discretion in furnishing CIC. The latest consent form submitted by Amber's parents includes, at this court's request, her physician's statement on how Amber is to be catheterized and the precise times during the day she should be catheterized. The school district thus is relieved from having to exercise medical discretion.

17. As for the school district's earlier suggestion that there has been no showing that the school district receives federal funds, the superintendent of the school district conceded that the school district receives federal funds allocated for special education.

capped children be furnished free appropriate education. *See Monahan v. Nebraska, supra,* at 1094. But the cost of recognizing a general right of recovery is that educational institutions may be inhibited from implementing new curricula and techniques for fear of exposure to liability. *See Loughran v. Flanders, supra,* at 115. Such a development could frustrate Congress' intent to expand and improve the education and related services available to handicapped children. *Id.* at 114. These concerns seem relevant to whether the relief would be appropriate. We do not here reach this question because the actual proved damages are of a different sort.

While plaintiffs occasionally have suggested that they are entitled to a wide range of compensatory damages, the only damages they were able to prove was the cost of sending Amber to the Helping Hand Development Center and the Special World Day Care Center. *See* page 972, *supra.* The issue here thus is not whether the EAHCA exposes school districts to open-ended tort liability, but whether school districts must reimburse parents of handicapped children for the cost of providing services the district was obligated to furnish but did not. In this regard, it is important to note that damages for such substitute services are only available where the child is applying for *initial admission.* Once the child is enrolled in a public school, the EAHCA requires the child to remain in its current educational placement pending EAHCA proceedings. 20 U.S.C. § 1415(e)(3); *see Stemple v. Board of Education,* 623 F.2d 893, 897–98 (4th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). Thus, if the parents remove the child from school while proceed-

ings are pending, they will not be reimbursed for the cost of providing appropriate private education. *See id.*

■ Where, however, as here, the parents cannot enroll the child without a risk of injury to the child because a school will not provide a required related service, appropriate relief ought to include the cost of alternative sources of education and therapy. Such discretion on the part of the parents is implicit in the requirement of § 1415(e)(3) that the school district enroll the applicant in its school program *with the consent of the child's parents or guardians.* The school district, by reimbursing the parents, indirectly bears the cost it would have borne directly had it furnished the services it was obligated to provide. That is, the money "damages" reflect no more than a judicially compelled provision of the statutorily ordered free appropriate education. This relief seems to fall within the congressionally mandated duty to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). This court here expresses *no opinion on whether* a similar analysis is appropriate where parents can enroll their child in the school district's program without risk to the child's health.[18]

This court thus concludes that for the limited type of damages plaintiffs have proved, they are entitled to recover under the EAHCA. Their right to recover, of course, is qualified by their duty to mitigate.

Plaintiffs claim that they suffered damages of $444 per month while Amber was enrolled at the Development Center (September, 1979 through August, 1980),[19] and $45 per week plus $100 per month during the sixteen weeks Amber was at the Day Care Center (September 1 through Decem-

---

**18.** Where the parents can enroll the child in the public school, and make private arrangements to remove the source of danger, under § 1415(e)(3) the school district may not be obligated to reimburse any more than the marginal cost of making its program acceptable. This, of course, simply restates plaintiffs' general duty to mitigate, discussed *infra.*

**19.** Plaintiffs' out-of-pocket expenses were $191 per month. Under the collateral source rule,

plaintiffs are entitled to the reasonable value of the services rendered by the Helping Hand Development Center even though most of the Center's expenses were paid by private charities. *See Restatement (Second) of Torts* § 921, comment c(3); *see generally* "Collateral Source Rule: Receipt of Public Relief or Gratuity As Affecting Recovery In Personal Injury Action," 77 A.L.R.3d 366 (1977).

ber 22, 1980). Plaintiffs' total claim up until this court's Interim Order thus is $6,419 plus attorneys' fees (*see* pages 985–986, *infra*).

The school district argues that even if plaintiffs are entitled to damages, they breached their duty to mitigate by not placing Amber in the school district's Early Childhood Development Classes and privately arranging for CIC. The district also notes that plaintiffs' expenses were for full-day supervision, some of which would have been incurred even if Amber had attended the school district's half-day program.

Plaintiffs' burden includes proof that the asserted damages were proximately caused by the alleged injury. *See Prosser on Torts* 236–44 (4th ed. 1971). In this, plaintiffs' proof is less than adequate.

Plaintiffs imply that none of the costs of placing Amber in the Helping Hand Development Center and the Special World Day Care Center would have been incurred had Amber been attending school. The evidence does not support their contention. As previously noted, Amber was scheduled to attend the school district's half-day program. Because both of Amber's parents are employed full time, it would have been necessary to arrange for supervision during the remainder of the day. Amber's parents thus would have had to arrange, at their own expense, for a day care center or a private babysitter for the period that Amber was not in school.[20] Indeed, a school district employee testified that many of the district's half-day pupils are bussed directly from school to their day care center or babysitter.

The school district notes that at least some of plaintiffs' expenses for outside supervision would have been incurred whether or not Amber had been placed with the school district. Plaintiffs offered no evidence from which this court can determine which of their expenses were incurred ·because of the school district's failure to provide CIC, and which would have been incurred under any circumstances.[21] It is plaintiffs' burden to show that their expenses are sufficiently related to the·alleged injury that compensation is warranted. Here, on the basis of the record, any such determination is purely speculative, and cannot be made. Although plaintiffs presumably could have submitted evidence from which this court could calculate the damages proximately caused by the school district, they have not done so.

There is one exception to this analysis. Amber received physical therapy at the Helping Hand Development Center from September, 1979, through May, 1980, and September through December 22, 1980,[22] that would have been provided by the school district had Amber been able to attend the school district's half-day program. A reasonable value of $100 per month was placed on that service. Plaintiffs, therefore, are entitled to damages, not including attorneys' fees, of $1,271.

There is substantial merit to defendants' contention that plaintiffs failed to mitigate damages. A school district employee testified that she had recommended to Amber's parents that Amber be enrolled with the school district and that CIC privately be arranged pending the dispute's resolution. If the district lost, it would reimburse plaintiffs' expenses. Plaintiffs never satisfactorily explained why they chose to forego this option. Their failure to make such an arrangement is particularly disturbing in that

---

**20.** Although the programs of the Development Center and Day Care Center are almost full-day, Amber apparently had a private babysitter for part of the late afternoon.

**21.** Mary Tatro testified that she paid Amber's babysitter $15 to $25 per week. But the hours that Amber was placed with her babysitter appear to be far less than what would have been necessary had Amber been attending the school district's half-day program. Moreover,

there was no evidence that such services would have been available, or that Amber would have been placed with a babysitter rather than in a day care center for that period.

**22.** Amber also received such therapy from June through August, 1980. Amber's IEP did not, however, indicate that she would be receiving any therapy during the summer months, and there is no evidence that such would have been provided by the school district.

plaintiffs arranged for Amber to be catheterized at school by her babysitter for over two months after this court had entered its Interim Order. See page 972, *supra*. Plaintiffs introduced much evidence to show how simple a procedure CIC really is, and how quickly and safely it can be performed by a lay person with only an hour's training. Amber would have needed to be catheterized only once during her school day at some pre-arranged time. This court agrees with defendants that it would have been a reasonable and relatively simple solution for plaintiffs privately to have arranged for such a service.[23]

The burden of showing failure to minimize damages rests with the wrongdoer. See *Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930, 932 (5th Cir. 1979). The defendant must show that the failure was unreasonable and had the consequence of aggravating the harm. *Id.* Defendants have demonstrated the first element, but not the latter. The only evidence on what the cost of privately arranged CIC might have been is the value placed by Amber's babysitter on her own services. Amber's babysitter testified that although she did not charge plaintiffs for her trips to the school to catheterize Amber and did not expect any remuneration, she valued her services at ten dollars per trip. No foundation, however, was laid by plaintiffs to show that Amber's babysitter had sufficient personal knowledge to testify as to the reasonable value of catheterization services. But even accepting ten dollars per trip as the reasonable value of privately arranged catheterization, it is obvious that over the relevant period (September, 1979 through December, 1980), plaintiffs would have expended more than $1,271 in such services. Thus, plaintiffs' conduct may have been unreasonable but it did not aggravate the harm (that is, at least not when measured in dollars and cents, see note 23, *supra*).[24]

Plaintiffs also request damages (the cost of providing CIC)[25] and attorneys' fees incurred after this court entered its Interim Order. As earlier discussed, after providing CIC for approximately a week, the school district discontinued catheterization because of plaintiffs' failure to submit a parental consent form and physician's prescription meeting the school district's requirements. The school district contends that plaintiffs were uncooperative and unreasonable,[26] while plaintiffs maintain that the school district was not entitled to the type of consent form and physician's prescription it had requested. From the evidence adduced at the March 13th and April 23rd hearings, this court finds that the school district's requested parental consent form and physician's prescription were reasonable. Although the final agreed to consent form and prescription are not identical to those originally requested by the school district, they meet many of the school district's requirements. In particular, this court believes that the school district's insistence that the prescription be written in a manner not requiring medical discretion on its part was a legitimate request and one plaintiffs should have complied with. This court also notes that the school district never disavowed its duty to provide CIC under this court's Interim Order, and went to some length to accommodate plaintiffs. Because the school district violated no duty, plaintiffs are not for this reason entitled to

23. The victim of plaintiffs' failure to mitigate is Amber. A school district employee and Amber's physician testified that Amber would have benefited from attending the school district's Early Childhood Development Classes.

24. Alternatively, if the testimony of Amber's babysitter is considered nonprobative, defendants failed to meet their burden by not offering any evidence on the cost of catheterization services.

25. Presumably, plaintiffs contend that under the collateral source rule they are entitled to the value of the services rendered by Amber's babysitter, even though they suffered no out-of-pocket expenses. See note 19, *supra*.

26. The school district offered evidence showing that at the time it and plaintiffs were discussing the consent form and prescription, Mary Tatro was threatening officials of the district with additional lawsuits as well as requesting the Texas Medical Association to investigate the school district's medical consultant.

damages and attorneys' fees incurred after this court's Interim Order. We turn to the more difficult question of whether attorney fees are recoverable at all.[27]

## Attorneys' Fees

The EAHCA does not provide for an award of attorneys' fees, *see Anderson v. Thompson*, 495 F.Supp. 1256, 1268–70 (E.D. Wis.1980); *see also Hines v. Pitt County Bd. of Educ.*, 497 F.Supp. 403, 409 (E.D.N.C. 1980), and they are not recoverable unless they may be awarded pursuant to 42 U.S.C. §§ 1983, 1988; *see Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Maher v. Gagne*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), or 29 U.S.C. §§ 794, 794a(b).

Since passage of 42 U.S.C. § 1988 in 1976, courts may in their discretion allow a prevailing party a reasonable attorney's fee as part of the costs in actions or proceedings to enforce certain statutory provisions. One of the listed provisions is 42 U.S.C. § 1983, and the Tatros throughout this suit have argued that they were seeking relief under § 504 of the Rehabilitation Act and § 1983 as well as the EAHCA.

The Tatros can recover counsel fees only under three possible theories. First, it can be contended that an award of counsel fees is "appropriate relief" under 20 U.S.C. § 1415(e)(2). Second, it can be argued that this is an action to enforce rights under 42 U.S.C. § 1983, and that § 1988, therefore, authorizes an award of fees. Third, the Tatros may be entitled to attorneys' fees under 29 U.S.C. § 794a(b) (§ 505) from a State denial of rights under § 504.

*Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) seemed to provide strong support for the attorney fee application under the second theory. In *Thiboutot* the Court held that the "and laws" language of § 1983 allowed a suit for a denial by *Maine* of benefits to which plaintiffs claimed entitlement under the federal Social Security Act. The Court also held that the "any action" language of

§ 1988 authorized an award of counsel fees for the suit. Three justices dissented, expressing concern over the apparent open-ended reasoning of the majority. The dissent, authored by Justice Powell, pointed out that the majority's construction creates rights of action under § 1983 for which there is no grant of federal jurisdiction. It reasoned that, contrary to the effect of the majority's holding, § 1983 has always been read to be coextensive with 28 U.S.C. § 1343(3) which supplies jurisdiction for claims involving rights secured by the Constitution or by any act of Congress providing for equal rights of citizens. In listing by illustration the possible rights of action created by the majority, the dissenting justices observed that the "only exception will be in cases where the governing statute provides an exclusive remedy for violations of its terms. See *Adickes v. Kress & Co.*, 398 U.S. 144, 150–151, n.5 [90 S.Ct. 1598, 1604–1605, n.5, 26 L.Ed.2d 142] (1970); *cf., Great American Fed. S. & L. Assn. v. Novotny*, 442 U.S. 366 [99 S.Ct. 2345, 60 L.Ed.2d 957] (1979)." *Id.*, 100 S.Ct. at 2513, n.11 (parallel citations omitted).

Assuming for now the EAHCA to be an act of Congress providing for equal rights of citizens within the meaning of § 1343(3), this court has jurisdiction over the § 1983 claim. *Cf., Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979). It appeared that *Thiboutot* answered the question before this court, despite the caveat implicit in the expressed unease of three justices. Recently, however, the three were joined by Stewart and Stevens in *Pennhurst State School and Hospital v. Halderman*, —— U.S. ——, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) in casting doubt on such a sweeping construction of *Thiboutot*. In *Pennhurst*, the Court suggested two qualifications to a possible § 1983 application. First, the right claimed to be denied by the State must be a "right secured" by the laws of the United States. Second, Justice Powell's footnote in the *Thiboutot* dissent regarding exclusivity

---

**27.** No evidence was offered to sustain the prayed for $50,000. Plaintiffs have not shown any bad faith or malicious conduct on the part of any defendant.

of remedy, 100 S.Ct. 2513 n.11, gained majority support. Even Justice White's dissent in *Pennhurst* acknowledged that "Congress may explicitly direct otherwise such as if the 'governing statute provides an exclusive remedy for violation of its terms.'" *Id.* —— U.S. at ——, 101 S.Ct. at 1557. This court will address these two inquiries first in determining the applicability of § 1983 to the EAHCA, and then will turn to § 504.

The right to a free appropriate education is plainly secured by the Act. The more difficult question is whether Congress intended the remedies it created to ensure such an education to be exclusive; that is, whether the EAHCA falls under the "Powell exception." Undoubtedly, Congress can, by express language, provide either that a created remedial scheme is or is not the only enforcement mechanism for a congressional enactment.

In addressing the applicability of § 1983 to the EAHCA, this court will first assume that compliance with the Act's remedial scheme is not held to be a prerequisite to federal suit. *See Patsy v. Florida Intern. University*, 634 F.2d 900 (5th Cir. 1981) (*en banc*), and will then make the contrary assumption. This court proceeds in both directions because there is substantial disagreement among the Circuits as to the exhaustion requirement, and the Supreme Court has not yet decided the question. This court usually would stop with an *en banc* decision of the Fifth Circuit because it binds this court. Here, however, there is a Janus faced quality to the reliance in this case upon § 1983 to enforce rights secured by the EAHCA. Plaintiffs face a virtual conceptual "catch-22." A contention that the EAHCA may be enforced by § 1983 without exhausting the EAHCA remedies breathes life into the argument that its remedial scheme is exclusive. But, a concession that such exhaustion is a prerequisite breathes life into the argument that no action under § 1983 has been prosecuted; that its citation alone is insufficient to trigger § 1988.

### Exclusivity Without Exhaustion

The difficult task is the inferring of intended exclusivity of remedy from the detail of the particular remedial scheme. Here, applying the standards set forth in the Court's recent opinions, such an inference is both plain and compelling.

In *Pennhurst*, the majority did not reach the question of § 1983 applicability, having concluded that § 6010 of the Developmentally Disabled Assistance and Bill of Rights Act conferred no substantive rights. Justice White, joined by Brennan and Marshall, reached a contrary conclusion and then faced the exclusivity issue. At the outset, the dissenting justices pointed to *Chapman v. Houston Welfare Rights Org., supra,* for the proposition that "§ 1983 protections apply to all rights secured by federal statutes 'unless there is a clear indication in a particular statute that its remedial provisions are exclusive *or that for various other reasons a § 1983 action is inconsistent* with congressional intention.'" —— U.S. at ——, 101 S.Ct. at 1557 (emphasis added). The dissent reasoned that the creation of a federal agency to oversee a cooperative state-federal venture was not alone sufficient to infer that Congress intended the oversight to be exclusive. It then found language in § 6010's legislative history that Congress contemplated that the "rights" under § 6010 "should be protected and assured by the Congress and the courts." *Id.* at —— —— ——, 101 S.Ct. at 1558. In sum, the dissenting justices found that *Thiboutot* "creates a presumption that a federal statute creating federal rights may be enforced in a § 1983 action." *Id.* at ——, 101 S.Ct. at 1557.

The dissent's conclusion plowed no new ground. Where Congress has spoken explicitly, the Court has had little difficulty finding remedial exclusivity. *See Adickes v. S. H. Kress & Co., supra,* (§ 1983 cannot supplement Title II, the Public Accommodation Provisions of the 1964 Civil Rights Act, 42 U.S.C. § 2000a). Where recognition of 42 U.S.C. § 1985(c), as supplementary to a detailed remedial scheme, would frustrate the scheme, the Court has found exclusivity.

Thus, in *Great American Fed. S. & L. Assn. v. Novotny, supra*, the Court refused to allow prosecution under § 1985(c) of rights secured by Title VII of the 1964 Civil Rights Act. The Court observed that § 1985(c) confers no substantive rights itself; that "[u]nder Title VII, cases of alleged employment discrimination are subject to a detailed administrative and judicial process designed to provide an opportunity for nonjudicial and nonadversary resolution of claims." *Id.*, 442 U.S. at 372–73, 99 S.Ct. at 2349–2350. The Court pointed to the requirement that a complainant must first go to a State employment commission, to the conciliation processes, and to the time limits for the filing of claims. It also noted that the Act withholds resort to the courts until these processes are exhausted. Finally, it observed that Title VII has been judicially construed as not allowing general or punitive damages or jury trials. Permitting the case to proceed under § 1985 would allow a complaint to by-pass the administrative process. After gathering analogical support from *Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976) (holding § 717 of Title VII to be the exclusive federal remedy for employment discrimination claims of federal employees) the Court concluded that "[u]nimpaired effectiveness can be given to the plan put together by Congress in Title VII only by holding that deprivation of a right created by Title VII cannot be the basis for a course of action under § 1985(c)." *Id.*, 442 U.S. at 378, 99 S.Ct. at 2352.

The EAHCA is not silent about either the judiciary's or the administering agency's roles in resolving disputes arising under its provisions. Section 1415 details procedures granting parents access to records, written notice to parents of proposed changes or refusals to change the placement of a child, opportunity to present complaints regarding the education, and an impartial due process hearing by the State educational agency. The statute provides that the hearings will allow participation of counsel, cross-examination, a right to a verbatim record and written findings. Only after administrative remedies have been exhausted may *de novo* review by State or federal court be sought. Although the reviewing court may take additional evidence, the statute provides that the court shall receive the records of the administrative proceedings. 20 U.S.C. § 1415(e)(2). Finally, the statute mandates the preservation of the status quo during the pendency of any proceeding under the Act. *Id.* § 1415(e)(3).

Given this carefully constructed scheme, the teachings of *Novotny* and *Brown* compel the conclusion that it need not be eviscerated by tolerance of § 1983 suits. Section 1983 creates no substantive rights but is solely a procedural statute. *See Chapman v. Houston Welfare Rights Org., supra*. It is illogical to conclude that Congress created an elaborate administrative review mechanism at local and State levels, yet, simultaneously, envisioned that anyone wishing to do so, could proceed directly to federal court. While the federal courts are given an important role by the EAHCA, it is not an open-ended responsibility. Their role is limited in two material ways. First, the federal judicial review is not available until after at least two levels of State administrative review have failed to adjust the dispute. Second, under this scheme, even if the dispute is not resolved at the administrative level, the reviewing court will have before it a fully developed administrative record, presumably reflecting the nuances of the decisions of the school and the parents. Section 1983, however, has no such constraints. Moreover, like Title VII, judicial decisions have limited the type of damages recoverable under the EAHCA. For example, there is no recovery of private tuition expenses for children withdrawn from school before completion of the review procedure. *See Stemple v. Board of Education, supra*. Recognizing a right of action under § 1983 for rights "secured" by the EAHCA would open the door to a range of damages unavailable under the EAHCA, and thereby undermine the entire analytical focus of granting relief as appropriate under the EAHCA. Finally, the status quo requirement of § 1415(e)(3) could be cast aside if relief became availa-

ble under § 1983. In the words of the *Novotny* majority:

> Unimpaired effectiveness can be given to the plan put together by Congress [in the EAHCA] only by holding that deprivation of a right created by [the EAHCA] cannot be the basis for a course of action under [§ 1983]. *Id.*, 442 U.S. at 378, 99 S.Ct. at 2352.

Yet, the compelling force of *Novotny* and *Brown* is met head-on by *Thiboutot.* Plainly, the Social Security Act contains an elaborate internal remedial scheme. But the potential for its destruction by § 1983 enforcement was not discussed in *Thiboutot*, even by the dissent. It is difficult, if not impossible, to reconcile this aspect of *Thiboutot* with the Court's pronouncement in *Novotny* and *Brown.*

### Exclusivity With Exhaustion

The disruptive consequences of recognizing a § 1983 suit are substantially reduced, if not eliminated, if exhaustion of EAHCA administrative remedies is a prerequisite to a § 1983 suit. In *Patsy v. Florida Intern. University, supra,* the Court of Appeals held that exhaustion of administrative remedies would be required in appropriate cases. Because none of the four traditional exceptions to required exhaustion, as stated in *Patsy*, are present here, there appears to be no reason not to require exhaustion of remedies in compliance with EAHCA. *Id.* at 903–04. The EAHCA thus does not foreclose a § 1983 suit provided *Patsy* exhaustion is a prerequisite to suit.

But if exhaustion of administrative remedies is required under both the EAHCA and § 1983, and, all the proved damages are available under the EAHCA, there is the additional consideration that § 1983 serves no purpose other than that of a conduit for attorneys' fees. It appears that the Tatros, at least until this suit was filed, in no way relied upon a § 1983 claim, unless it is assumed that all of the activity before ARD Committee, the Impartial Due Process Hearing Officer and the administrative appeals were all § 1983 prosecutions because they were required exhaustion steps.

Whatever may be the role of § 1983 where the attack is upon the adequacy of procedures themselves, this court sees no role for § 1983 here. Where § 1983 has no greater role than the statute it purportedly "enforces," its citation will not trigger the § 1988 attorney fee provisions. Specifically, this was not "an action or proceeding to enforce a provision of [§ 1983]."

As Justice Powell noted in his *Thiboutot* dissent, "[t]he uses of this technique have not been explored fully." 100 S.Ct. at 2514. But this court has had experience in other contexts with multi-claim litigation where there is a statutory basis for counsel fees only for part of a claim. Whether the descriptive phase be "gravamen" or some other expression of predominance, this court sees no basis for awarding fees when the fee triggering statute plays no role but that of allowing attorney fees.

This court turns now to the question of whether § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 700, *et seq.*, secures a right enforceable either under § 1983 so as to allow recovery of § 1988 attorney fees or by an implied right of action under § 504 so as to allow recovery of fees under 29 U.S.C. § 794a(b).

With the EAHCA, our primary focus was upon remedial exclusivity, the second *Pennhurst* inquiry. That focus shifts here to the first inquiry, whether the general proscription of § 504 imposes an obligation upon Texas, enforceable by a Texas citizen—a question logically antecedent to whether there is an implied right of action or whether its "obligation" is enforceable by 42 U.S.C. § 1983.[28]

This question is controlled by *Pennhurst State School and Hospital v. Halderman, supra,* where the court construed the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6010. The Court

---

**28.** Therefore, this court will not dwell upon the relationship between § 1983 and § 504 in the context of attorney fees. If there is a right secured after *Pennhurst*, § 794a(b) explicitly authorizes attorney fees.

held that Congress must express clearly its intent to impose obligations upon the states when it acts under its spending power—"if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*, —— U.S. at ——, 101 S.Ct. at 1540. Because the lower courts had almost uniformly held that § 504 is enforceable by an implied right of action, and because the Congress, by passage of § 794a(b), authorized attorney fees, there has been little need to press § 1983 as the procedural expression for § 504 violations. And in *Tatro v. Texas, supra,* the Court of Appeals found that the Tatros have rights secured under § 504 and an implied right to enforce them.

The Court in *Pennhurst* referred to § 504 in illustrating the failure of the lower court "to recognize the well-settled distinction between Congressional 'encouragement' of state programs and the imposition of binding obligations on the States." at ——, 101 S.Ct. at 1544. The Court continued:

> Relying on that distinction, this Court in *Southeastern Community College v. Davis,* 442 U.S. 397 [99 S.Ct. 2361, 60 L.Ed.2d 980] (1979), rejected a claim that § 504 of the Rehabilitation Act of 1973, which bars discrimination against handicapped persons in federally funded programs, obligates schools to take affirmative steps to eliminate problems raised by applicant's hearing disability. Finding that "state agencies such as *Southeastern* are only 'encouraged' . . . to adopt such policies and procedures,' " *Id.* at 410 [99 S.Ct. at 2369] (quoting the Act), we stressed that "Congress understood that accommodation of the needs of handicapped individuals may require affirmative action and knew how to provide for it in those instances where it wished to do so." *Id.* at 411 [99 S.Ct. at 2369]. Likewise in this case, Congress was aware of the need of developmentally disabled persons and plainly understood the difference, financial and otherwise, between

encouraging a specified type of treatment and mandating it.
*Id.*

This court makes no pretense that it comprehends the intended reach of the quoted language. In *Southeastern,* the Court expressly reserved the question of enforcement by an implied right or action under § 1983. 442 U.S. 397, 404 n.5, 99 S.Ct. 2361, 2366 n.5, 60 L.Ed.2d 980.

The Circuit's holding in *Tatro v. Texas, supra,* is binding upon this court unless plainly undermined by the later decided *Pennhurst.* This court and the Court of Appeals obviously differ on the reach of *Southeastern.* Moreover, another panel of the Court of Appeals reached a result contrary to the view of this court in *Camenisch v. University of Texas,* 616 F.2d 127 (5th Cir. 1980), *vacated,* —— U.S. ——, 101 S.Ct. 853, 66 L.Ed.2d 797 (1981). The Supreme Court's remand of *Camenisch* left the question unresolved because it did not address the merits of the § 504 issues.

■ This court remains unconvinced as to the applicability of § 504; its views reinforced by *Pennhurst.* Yet, there is no intervening decision speaking with sufficient clarity to allow this court to take a course different from that of the Court of Appeals. This court's conscience is to follow the law; and *Camenisch* and *Tatro* are the law of this Circuit until they are overturned by the Supreme Court. For these reasons of institutional order, this court finds that 29 U.S.C. § 794a(b) authorize an award of reasonable attorney fees to plaintiffs. It turns now to their amount.

### Awarded Attorneys' Fees

Plaintiffs request attorneys' fees of $30,-000 and expenses of $2,314. Craig Enoch, attorney for plaintiffs, testified that approximately 334 hours of attorney time were devoted to this case up to the January trial. This court estimates that the trial necessitated an additional twelve hours.[29]

**29.** Enoch also testified that 64.4 hours were devoted to this case after this court entered its Interim Order. For the reasons stated above, no attorneys' fees will be awarded for those hours.

Enoch also testified that 145 hours of law clerk time were used in preparation. Plaintiffs contend that the attorney time should be billed at $90 an hour, and the law clerk time at $45 an hour.

■ In determining a reasonable fee, this court looks to the twelve factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), as further explicated in *Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575 (1980). Those factors are:

(1) The time and labor required;

(2) The novelty and difficulty of the questions;

(3) The skill requisite to perform the legal service properly;

(4) The preclusion of other employment by the attorney due to acceptance of the case;

(5) The customary fee;

(6) Whether the fee is fixed or contingent;

(7) Time limitations imposed by the client or the circumstances;

(8) The amount involved and the results obtained;

(9) The experience, reputation, and ability of the attorneys;

(10) The "undesirability" of the case;

(11) The nature and length of the professional relationship with the client; and

(12) Awards in similar cases.

*Johnson*, at 717–19.

As noted in *Copper Liquor*, at 583, "recent decisions . . . suggest that district courts, in computing attorneys' fees, should pay special heed to *Johnson* criteria numbers (1) the time and labor involved, (5) the customary fee, (8) the amount involved and the results obtained, and (9) the experience, reputation, and ability of counsel."

At the outset, it must be noted that Enoch is relatively inexperienced. At the time of the initiation of this dispute, Enoch had been practicing for approximately three and a half years, and had been a member of the federal bar for only two and a half of those years. During that time he had accumulated virtually no experience as a civil rights counsel, and had only limited experience in federal litigation. Although it is improper to penalize an attorney for his recent admission to the bar, *see Johnson v. Georgia Highway Express, Inc., supra*, at 719, the *Johnson* factors nevertheless require this court to consider the experience, reputation, and ability of counsel.

Enoch testified that he believes $90 an hour to be a reasonable and customary fee. This court concurs that such an hourly rate is appropriate and reasonable for an attorney experienced in civil rights actions of this general nature. This court has reservations, however, at reimbursing a relatively inexperienced lawyer at such a rate.

■ Enoch submitted time records indicating the hours spent on briefing, trial preparation and other services. Upon reviewing those records, this court concludes that the time devoted by Enoch to this case was greater than that which would have ordinarily been required by an attorney with experience in civil rights and federal litigation.[30] As such, this court believes

30. The following items are illustrative of why this court believes the amount of billed time to be excessive: (1) From October 4 to October 12, 1979, plaintiffs' attorneys spent over seventeen hours preparing and filing the original complaint and request for injunctive relief. That document consists of little more than lengthy citations from the relevant statutes and a recitation of the essential facts. Plaintiffs at that time already had completed three levels of administrative review, and were intimately familiar with the facts and applicable law. (2) From October 24 to November 8, 1979, plaintiffs' attorneys needed approximately fourteen hours to prepare both a motion to amend the complaint and the amended complaint. The motion to amend, which cited virtually no law, and was two and a half pages long, requested this court to permit plaintiffs to join the Texas Education Agency, Commissioner Bowen, and the individual members of the involved Boards. The amended complaint was a duplicate of the original complaint, with the new parties "pasted in." (3) From December 3 to December 11, 1980, plaintiffs' attorneys required approximately six hours to prepare a six and half page memorandum in opposition to defendants' motions to dismiss. In that memorandum, almost

that Enoch's request must be discounted by some factor that reflects his inexperience. Such a determination necessarily is somewhat arbitrary. But on the basis of Enoch's written submissions to and personal appearances before this court, it is this court's conclusion that an appropriate and reasonable hourly rate is in the area of $60 an hour. A contingency factor of 20% is reasonable, bringing the rate to $72 an hour. Multiplying that rate by the hours testified to, plaintiffs are entitled to reasonable attorneys' fees of $24,192.[31]

Plaintiffs' attorneys acknowledged at the trial that their time may appear excessive at first blush. They assert, however, that the complexity of the case required such an investment of time and effort. This court is acquainted with the legal and factual issues raised by this case. Factually, this case is not sufficiently complex to warrant the requested award. The record in this case is relatively straight-forward, and was developed early in the course of the administrative proceedings. With the exception of the permissible time interval between catheterizations, most of the facts necessary for granting injunctive relief were undisputed. Plaintiffs' attorneys are correct in noting that the legal issues here are both complex and novel. But this complexity was not reflected in plaintiffs' attorneys' work. Plaintiffs' attorneys' memoranda and oral arguments were of little assistance to this court in resolving the legal issues raised by this case. The number of hours devoted by plaintiffs' attorneys to this case

thus appears to be less the product of any factual or legal complexity than the result of their relative inexperience. I intend no criticism of counsel for lack of experience; the question is compensation and experience is relevant.

Looking to the other *Johnson* criteria, this court finds that plaintiffs' attorneys were not prejudiced by having been precluded from accepting more lucrative employment; that there were time limitations imposed by the circumstances, but that such limitations were not inordinately severe or unusual for federal litigation; that plaintiffs' attorneys do not have a reputation as experienced civil rights and federal litigator,[32] and that the case was not "undesirable." This court also determines that while the money involved here is not substantial, the awarded prospective relief is necessary for Amber's continued well-being. Taking all these factors into consideration, this court finds reasonable attorneys' fees to be $24,192.[33] In addition, plaintiffs will be awarded reasonable attorneys' expenses of $3,039.[34]

Judgment is by separate instrument filed herewith.

## APPENDIX

### AMICUS CURIAE ADDRESSING QUESTIONS RAISED IN ORDER

#### TO THE HONORABLE UNITED STATES DISTRICT COURT:

**32.** Plaintiffs' attorneys initially were retained with regard to the administrative proceedings before the involved Texas agencies.

**33.** This court awards an additional $7,200 (100 hours at $72 an hour) if this case is appealed to the Fifth Circuit by defendants.

**34.** Considering that a not insubstantial portion of the clerk time was devoted to secretarial type duties rather than legal research, such time is reimbursed as an expense item at the rate at which the clerk was paid, five dollars an hour. *See generally Jones v. Armstrong Cork Co.*, 630 F.2d 324 (5th Cir. 1980) (may not bill paralegal time where most of time was in performance of clerical duties).

half of which is quotations, plaintiffs cite a total of three federal district court decisions. Most of defendants' contentions already had been raised and briefed earlier in the litigation, and plaintiffs' response essentially was to reassert its previous arguments. In that regard, it is worthwhile noting that defendants did raise some issues—particularly the applicability of *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)—to which plaintiffs simply did not respond. *See* Memorandum Opinion of December 31, 1980, pages 2–4.

**31.** Plaintiffs' attorneys have billed approximately ten hours spent deliberating with the press. As noted by plaintiffs' own expert witness, plaintiffs request to be reimbursed for this is inappropriate.

As invited in this Court's Order of February 6, 1981, the Texas Medical Association and the Dallas County Medical Society respectfully submit this *Amicus Curiae* brief and request that it be considered by this Honorable Court.

### STATEMENT OF INTEREST

The Texas Medical Association is a non-profit corporation organized under the laws of the State of Texas. Its membership consists of approximately 18,500 physicians. The Dallas County Medical Society is composed of physicians practicing in Dallas County, Texas. Its membership consists of approximately 3,000 members. Questions concerning the provision of medical care for patients in Texas by licensed physicians utilizing the skills of qualified nonphysicians are of major interest to these organizations and their members.

### ARGUMENT AND AUTHORITIES

The questions raised in the Court's Order of February 6, 1981, are addressed in the sequence of their presentation in that Order.

*Question (1)(a).* Whether under the Texas Medical Practice Act, *Tex.Rev.Civ. Stat.Ann.*, art. 4495, *et seq.* (Vernon 1978) employees of the school district can only provide CIC (the provision of CIC is described in the attached stipulation from the pretrial order in this case) if they are under the control and supervision of a licensed physician and what the training of such persons must be. These questions include the question of whether to furnish CIC without such supervision would be to engage in the unlawful practice of medicine. *Id.*, art. 4510, 4510a and 4510b. *See also*, art. 4518 V.A.T.S. and Op.Tex. Att.Gen.No. H–1295 (Dec. 28, 1978), H–395 (Sept. 9, 1974).

Under Texas law, a person is regarded as practicing medicine if he (she) professes to be a physician or surgeon and diagnoses, treats, or offers to treat any disease or disorder, mental or physical, or any physical deformity or injury, by any system or method, or seeks to effect cures thereof; or does the above acts and charges therefor, directly or indirectly, money or other compensation. (*Tex.Rev.Civ.Stat.*, arts. 4510 and 4510a (Vernon 1976)).

Thus, a person professing to be a physician who treats another for a disease or disorder, such as neurogenic bladder dysfunction using clean intermittent catheterization (CIC), is practicing medicine and must have a license to do so under Texas law. Similarly, a person who treats another for a disease or disorder and charges for that treatment is also practicing medicine and must have a license to do so lawfully.

Both the Dallas County Medical Society and the Texas Medical Association respectfully submit that CIC should not be administered to a patient except when ordered by a physician. It is a treatment used for selected patients with myelodysplasia and neurogenic bladders. (Enrile and Crooks, "Clean Intermittent Catheterization for Home Management in Children with Myclomeningocele," 19 *Clinical Pediatrics*, 743 (Nov. 1980)). Even though patients, parents, and others can be trained to perform the technical aspects of this treatment, this does not affect the judgment that CIC should be performed only under a physician's order. However, classification of CIC as the practice of medicine would not prevent the delegation of such a procedure by a physician to a nonphysician. The delegation of medical tasks by physicians to non-physicians has been an accepted part of the practice of medicine for years. *Thompson v. Texas State Board of Medical Examiners*, 570 S.W.2d 123 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.).

The parties in this case appear to agree that CIC is a procedure which, if provided by school system personnel, would only be provided when prescribed or ordered by a physician. The debate appears to be centered on the fact that physicians can and do delegate this task to others. However, administering the treatment itself by a non-physician under a physician's order is not the unlawful practice of medicine even if a charge is made for the treatment provided. If providing CIC is not considered to be the

unlawful practice of medicine because it is a treatment which the physician can delegate to others, this does not mean that it is a treatment which need not be ordered by a physician. In Texas, a nurse or an unlicensed lay person may not lawfully decide that a treatment such as CIC is needed for a particular condition (diagnose), administer treatment, and "charge therefor, directly or indirectly, money or other compensation" without a physician's direction. (*Tex.Rev. Civ.Stat.*, arts. 4510, 4510a, 4510b (Vernon 1976)).

The definitions of the practice of medicine, nursing, and the other licensed health professions overlap to some extent. This overlapping creates the result that the same act when performed by a nurse under the direction of a physician is considered to be part of the practice of nursing and when performed by a physician is considered to be the practice of medicine.

The Texas Attorney General recognized this result in 1962 when he defined the practice of nursing prior to the inclusion of the definition of professional nursing in what is now commonly referred to as the "Nursing Practice Act," (*Tex.Rev.Civ.Stat. Ann.*, art. 4513 *et seq.* (Vernon 1976 and Vernon Supp. 1980–1981)). This definition formulated by the Attorney General included the following statement recognizing the delegation of medical tasks:

> "Generally speaking, the duty of the nurse is to carry out the medical treatment prescribed by a doctor for his patient." (Tex.Att.Gen.Op.No. WW–1403 (1962))

The practice of nursing is more precisely defined today. (*Tex.Rev.Civ.Stat.Ann.*, art. 4518, sec. 5, (Vernon Supp. 1980–1981)). The statutory definition includes:

> " ... The administration of ... treatments as prescribed by a licensed physician ... "

Thus, nurses can lawfully perform medical functions delegated to them by physicians. When nurses do perform delegated medical tasks, they do so with the knowledge that administering these delegated treatments is part of the practice of nursing

and recognized as such in the state statutes defining nursing practice. When performing CIC as ordered by a physician for a particular patient, the nurse is practicing nursing as it is contemplated in the statutes.

*Question (1)(b).* The nature and extent of such supervision.

Once a physician has determined that CIC or any other treatment modality is appropriate for his or her patient, the physician may delegate performance of part or all of the treatment to another. The physician continues to monitor the progress of the patient, making sure that the treatment is being properly performed and is progressing without complication. The treatment, whether performed by the physician, a nurse, a parent, or the patient, is a treatment ordered and monitored by the physician.

The extent of the supervision or control which is proper in cases where CIC is ordered must be determined by each physician in each case, taking into consideration (1) the needs and capabilities of the patient and (2) the training, experience and competence of the individual (parent, teacher, patient, or nurse) who will be monitoring or performing the procedure ordered by the physician. One thing is certain: a patient being provided CIC by nurses, school teachers, or others under a physician's orders will expect that the treatment provided will conform to the same standard of care as would apply if a physician were providing the treatment.

Concerning the physical location of the physician, the following statement made to the Attorney General by the Texas State Board of Medical Examiners in a 1973 Attorney General Opinion Request was referenced with approval in an Attorney General Opinion involving ambulance attendants not in the physical presence of a licensed physician:

> "Unlicensed persons could legally perform acts which would constitute the practice of medicine if such persons were under the reasonable control and supervi-

sion of a licensed physician." Tex.Att. Gen.Op.No. H–27 (April 12, 1973)

Several Attorney General Opinions have dealt with the meaning of such terms as "direct" and "on-site" supervision as those terms are used in describing the supervision required of the delegating physicians. Tex. Att.Gen.Op.Nos. C–795 (Dec. 30, 1966) and H–368 (Aug. 12, 1974). The degree of instruction or supervision by the physician was also discussed in a 1978 Attorney General Opinion addressing the scope of lawful practice by nurse midwives:

"Thus, even if performing an episiotomy or making sutures were held to constitute medical treatment, a registered nurse could provide these services at the doctor's direction ... The appropriate degree of instruction or supervision by the physician will vary with the nurse's experience and qualifications ... These qualifications are relevant to a determination of the appropriate degree of instruction and supervision to be provided by a physician. Tex.Att.Gen.Op.No. H–1293 (1978).

In the case of CIC, the technical aspects of the procedure are not complicated and can be performed successfully by children on themselves after appropriate training (boys by age 8 and girls by age 10). Wyndaele, Oosterlinck and De Sy, "Clean Intermittent Self-Catheterization in the Chronical Management of the Neurogenic Bladder," 6 *European Neurology* 107–110 (1980). Hannigan, in "Teaching Intermittent Self-Catheterization to Young Children with Myelodysplasia," 21 *Developmental Medicine and Child Neurology* 365–368 (1979), describes the successful training by nurses of several five year old children (one boy, three girls) to perform CIC on themselves. Of course, physician supervision and continuous monitoring by parents or nurses is vital to minimize the likelihood and severity of complications and to assure proper maintenance and sterilization of the equipment used.

CIC appears to be a procedure which can be safely performed while neither a physician or nurse is present. CIC can be done safely when a patient or other person is trained to perform it properly and is taught to recognize conditions which should be brought to the physician's attention.

Nonphysicians often care for patients under such circumstances. Even when relatively sophisticated treatment is being provided, nonphysicians are commonly placed in a role of deciding when a physician should be notified or when to institute treatment prescribed by a physician understanding medical orders written after the patient has been examined and diagnosed. The physician need not be present for every treatment ordered. The activities which commonly take place in a cardiac intensive care unit provide an illustrative example of such a situation. In an article by the present Assistant General Counsel of the American Medical Association, the following is recorded:

"When the nurse serves in the cardiac intensive care unit, she has the advantage of sophisticated equipment that extends her ability to make evaluations and improves the reliability of such evaluations. Her training may be more highly specialized for the tasks she performs in the unit than that of the average physician. When the nurse in the unit institutes treatment measures in emergency situations, she is instituting treatment prescribed by a physician in anticipation that such a contingency might arise." Anderson, "Orderly Transfer of Procedural Responsibilities from Medical to Nursing Practice," 5 *Nursing Clinics of North America* 311–319 at 318–319 (June 1970).

The nurse is not unlawfully practicing medicine in the situation described above. He or she is instituting treatment prescribed under a contingency order and, no doubt, has been placed in that position of responsibility because of demonstrated training, experience, and competence. The same should be true for any nurse, parent, or teacher who performs the CIC for the child. Each should have the necessary training to perform the treatment safely, and to know when the physician should be called.

*Question 2.* The conditions under which CIC ought to be provided consistent with conservative and sound medical judgment including both technique and the training level of the person administering it.

CIC should only be provided under the orders or directions of a licensed physician. Just as in any other treatment,

> ". . . a nurse should comprehend the cause and effect of any order a physician instructs to her execution. As nursing education and training have become more sophisticated, and as more medical acts have become technical in nature in that they are repetitive and are performed under controlled circumstances, physicians have delegated to nurses a greater variety of technical procedures. Today, nursing practice encompasses such procedures as the administration of injections intravenously and intramuscularly, the starting of blood transfusions, the performance of diagnostic procedures, and the utilization of complex mechanical devices in the performance of diagnostic and therapeutic procedures." Anderson, "Orderly Transfer of Procedural Responsibilities from Medical to Nursing Practice," 5 *Nursing Clinics of North America* 311–319 at 314 (June 1970).

The performance of procedures by nurses under a physician's order has been called ". . . dependent nursing functions (which) are those performed under the legal orders and direction or supervision of licensed physicians." (See Anderson *supra* at 314). These functions can be distinguished from recognized independent nursing functions, that is, those performed by virtue of the nurse's education, training, and experience, and which properly reflect the nurse's independent judgment. Such functions might include:

> "(T)he evaluation of a patient's condition for the purpose of determining his ability to care for himself or his requirements for nursing or medical attendance; the observation and reporting of symptoms and reactions; and the application and execution of nursing techniques and procedures. (See Anderson, *supra*, at 314).

The Joint Commission on Accreditation of Hospitals offers a voluntary accreditation mechanism for hospitals which is recognized by the Medicare program for purposes of determining a hospital's eligibility for participation. (See Commerce Clearing House *Medicare and Medicaid Guide*, "Conditions of Participation for Hospitals," para. 12,340 (Mar. 1979)). Thus, in the case of nurses performing dependent functions outside the hospital or nursing home setting, it may be helpful to review provisions, of the Joint Commission on Accreditation of Hospitals (JCAH) *Accreditation Manual for Hospitals* (1981 Edition) relating to home health services.

The section on "Home Care Services," pp. 57–62 of the JCAH *Manual,* provides in part:

> "Each patient receiving home care services shall be under the care of a physician, and shall be informed as to the identity of the physician primarily responsible for his care. Upon referral to the home care program, each patient shall receive an initial evaluation by a physician or registered nurse acceptable to the home care program, to determine the appropriateness of the patient's health care needs for home care services... The provision of all nursing and other therapeutic services provided in the home shall be under the supervision of a physician or registered nurse employed by the home care program. This individual or a similarly qualified designee shall be available during the operating hours of the program, and shall participate in activities relevant to the professional services provided to the patient, including the level of personnel required." (p. 58)

The JCAH *Manual* further provides that when services are to be provided by individuals or by a participating community agency on an hourly or per-visit basis, a written agreement must be prepared and must specify:

> "●The services to be provided...
> ●The manner in which services shall be coordinated, supervised, and evaluated by the hospital-administered home care program and its staff;

•The role of the hospital, the participating community agency, and the responsible physician in the establishment of a patient care plan;

•A statement to the effect that the patient care plan will not be altered unilaterally;

•The submission, within one week after each service/visit, of appropriate documentation (such as progress notes) of services provided;

•The participation in case conferences. . .

•The term of the agreement or contract, and the basis for its termination or renewal." (pp. 58–59)

The JCAH *Manual* also provides that a director of the home health care program shall be designated. The director's responsibilities include written descriptions of the responsibility of physicians and other professionals in the delivery of health services. The JCAH *Manual* also states that:

"Home care services provided through the hospital shall be delivered by personnel who have qualifications and abilities equivalent to those of personnel providing comparable services in the hospital, regardless of whether they are employed by the hospital or assigned by participating community service agencies. . . When the services of volunteers, supportive personnel, or technical assistants are to be employed in the provision of patient care services, such personnel shall be adequately trained and supervised, and their duties shall be specified in writing.

"The medical staff shall assure that the quality of care provided to home care patients is comparable to that provided to inpatients, ambulatory care patients, and emergency care patients. The medical staff may, consistent with hospital policy, designate one or more physicians to carry out this responsibility, or such responsibility may be a function of one of the committees of the medical staff. When the activities of a medical director employed by the home care program on a full-time or part-time basis include clinical responsibilities, he must have achieved and maintained medical staff membership through the same procedures provided for all medical staff members. Physician advice and/or consultation must be available to the home care program staff at all times. (pp. 59–60)

If a physician is not a member of the hospital's medical staff and requests the services provided by the home care program, a special procedure to credential that physician is provided, including a provision for evaluating the care provided to that physician's patients. (p. 60)

Written policies and procedures are required on the delegation of responsibility, as well as the "scope of services to be offered and the manner in which they are to be provided." (p. 60) These must be approved by the hospital's medical staff, administration, and governing body. (p. 60) A written patient care plan that conforms with the physician's orders must be developed for each patient. (p. 61) An "accurate medical record" shall be maintained which shall include progress notes including:

"a description of signs, symptoms; treatment, service, or medication rendered; patient reaction; any change in the patient's condition; and any patient/family instruction given." (p. 61)

Coordination and evaluation of patient services on a continuing basis are encouraged in this section. The "patient care plan" must be

"reviewed and evaluated as often as the patient's condition required, but not less than once every 60 days." (p. 62)

Some of the extensive requirements which now exist for those hospitals seeking accreditation by the JCAH when they provide home care programs have been described. Should schools begin providing similar services under a physician's order, a similar mechanism will likely evolve. To assure that the treatment provided by the school will be provided safely, proper coordination of activities and delineation of responsibilities will be necessary. If history is any guide, should schools be required to provide treatment as ordered by a pupil's physician, the JCAH or some other accrediting body

will be called upon to develop standards for administration of such treatment. These standards will then be recognized by Congress in legislation and will serve as a reference point for evaluating eligibility for federal funding.

*Question 3.* Any additional questions believed to be presented by this case that impact the practice of medicine or the medical community's role in providing children necessary maintenance while participating in their *individual education program.*

One question presented by this case concerns the direction by a physician of an act to be performed by a nurse or another trained person. If the physician is providing instruction not to a particular individual, but to an unidentified person selected in an organized system such as exists in a hospital, nursing home, or other organized setting, such an instruction may be proper and consistent with Texas law. The physician may reasonably rely on an existing system to assure that only those who are capable of carrying out his instructions do so. In such a situation, the physician is not necessarily liable for the acts of those carrying out his directions if the person to whom responsibility is delegated is selected by another upon whose judgment the physician can reasonably rely.

In an Amarillo case, a sponge had been left in the abdominal cavity of a patient during surgery. The patient sued the surgeon and the hospital which employed the nurses involved in the procedure.

The jury's verdict absolved the operating surgeon of any negligence of his own. The jury did find negligence on the part of the operating room nurses who were hospital employees, but declined to find that these employees were "borrowed servants" of the surgeon. On this verdict the trial court rendered judgment against the hospital only, not against the surgeon.

The Amarillo Court of Civil Appeals, in reviewing the trial court decision, reversed the judgment of the trial court and held the surgeon liable for the nurses' negligence under the "captain of the ship" doctrine. (*Worley Hospital v. Caldwell*, 529 S.W.2d 639 (Amarillo [Tex.]Civ.App.1975)). On appeal the Texas Supreme Court set aside the Amarillo appeals court's judgment and remanded the case back to that court. (*Sparger v. Worley Hospital*, 547 S.W.2d 582 (Tex.1977)).

The Texas Supreme Court noted that an employee of one employer may be the borrowed servant of another under Texas law. (See *Sparger v. Worley Hospital, supra*, at 583). The right to control is ordinarily a question of fact for the jury to decide. In this case the Supreme Court concluded that physicians should be subject to the usual rules applicable to borrowed servants. It held that the heavy burden of vicarious liability imposed by the "captain of the ship" doctrine as it has come to be applied in professional liability actions should no longer be applied in Texas. (*Sparger v. Worley Hospital, supra*, at 585).

The Supreme Court mentioned that in this case the nurses were assigned to the operating room by the hospital, their employer. The duties of the nurses were detailed in the hospital's Policy and Procedures Manual. Specific duties were assigned by the hospital to each nurse:

"The procedures for the sponge count were intended for use regardless of the surgeon who was to perform the operation ..." *Sparger v. Worley Hospital, supra*, at 586).

The physician was "in charge, medically speaking, of the nurses" (*Worley Hospital v. Caldwell*, 552 S.W.2d 534 at 535 (Tex.Civ. App.—Amarillo 1977)). Testimony at trial demonstrated that the physician had the right to control the nurses assigned to the operating room and in fact did direct them to take a second sponge count as the wound was being closed. (See Justice Johnson's opinion, dissenting from the opinion of the Supreme Court, 547 S.W.2d at 586–589). However, this degree of control did not persuade the appeals court on remand that the jury's refusal to find that the nurses were the borrowed employees of the doctor was against the great and overwhelming weight of the evidence. (*Worley Hospital v. Caldwell, supra*, 552 S.W.2d at 536).

The Texas Supreme Court in this case found that this physician was not necessarily liable for the acts of those who are selected by another person when those acts are performed under his direction for his patient. The right of the hospital to assign their employed nurses and determine their qualifications was not questioned.

Thus, a home health care agency, nursing home, or hospital with an established system to assign qualified persons to carry out a physician's instructions can properly select the agent to carry out the orders of a physician. However, when no such system exists, the physician may be held to have improperly delegated a treatment unless he selects specific individuals to carry out his treatment orders.

On November 21, 1980, an Attorney General Opinion was issued addressing the delegation of functions by a physician to an optician outside the physician's office. (Tex.Att.Gen.Op.No. MW–275 (Nov. 21, 1980)). The Attorney General opined that a physician's orders in such a situation must be directed to a particular optician or opticians and cannot lawfully be delegated to an unnamed optician of the patient's choice. The Attorney General reasoned:

> "Where a physician delegates a medical task to another person, he must provide adequate instruction consistent with that person's skill and knowledge... Since opticians are not licensed in Texas, he (the physician) cannot rely on a particular level of ability in the profession." (p. 2)

The Opinion also states that the delegation by a physician must be to a natural person, not to a corporation or other group since:

> "... only natural persons can be subject to the control or supervision of the physician." (p. 3)

The Opinion concludes that the physician is legally liable for the negligence of the optician in performing services under his direction.

However, in this case the Attorney General was faced with a fact situation of unlicensed opticians in Texas. Since no particular minimum level of ability of these unlicensed persons exists, the Attorney General could only conclude that the physician must delegate to a particular optician or opticians, and provide instructions appropriate to the ability of particular persons. Therefore, although this Attorney General Opinion concluded that physicians can only delegate properly to designated natural persons in the fact situation before him, there is no reason to believe that the Attorney General intended to suggest a change in the common practice of delegation to undesignated nurses and others in hospitals, skilled nursing homes, and home health care agencies. These individuals typically are assigned duties by the organizations which employ them under systems designed to assure that only competent persons carry out any physician's order.

If an institution such as a school has no system to assure that only qualified individuals will carry out a physician's order, we respectfully submit that the physician would be required to tailor his instructions to the individual who would carry them out just as the Attorney General concluded in MW–275, *supra*. The physician would need to satisfy himself that the individual who is to perform the task would be qualified to do so and that his instructions were sufficient to match the individual's training. On the other hand, if the school has in place a mechanism to assure safe delivery of the treatment prescribed and proper coordination of activities and responsibilities such as is described in the JCAH *Accreditation Manual for Hospitals* (1981) for home health services, the physician would be able to reasonably rely on the mechanism available and could tailor his instructions to a pre-established level of training for a person to be designated by the school system.

## CONCLUSION

All parties in this litigation appear to support the view that diagnosing a patient's condition and concluding that CIC treatment is appropriate are functions which

only licensed physicians should perform. The Texas statutes support this view. However, consistent with this view is the accepted practice in Texas of nonphysicians performing acts which, if performed independent of a physician, would constitute the unlawful practice of medicine, but when performed under a physician's direction, are considered to be lawful and proper.

The extent to which a physician may properly delegate medical treatment to a nonphysician is conditioned in each case by the needs of the patient and by the experience and training of the nonphysician to perform the functions delegated. The Nursing Practice Act contemplates such a delegation of dependent nursing functions. The physician need not be physically present during administration of all treatments. The physician should, however, monitor the treatment rendered even though some of the treatment might be simple enough that children can perform certain technical aspects on themselves. The potential for harm, should all the steps in treatment not be adhered to or should an adverse reaction occur, warrants overall physician supervision of the treatment provided.

If a school system undertakes to provide CIC to its pupils under a physician's supervision, the responsibility for daily administration of CIC treatment will be delegated by the physician either (1) to persons the physician reasonably believes are capable of discharging them in a competent manner, or (2) to an organization which has in place a mechanism to assure safe delivery of the treatment prescribed. In either case, the physician would tailor his instructions to the individual providing the care or would write orders for those selected by the school system to provide the treatment based on a pre-established level of training for those individuals.

DALLAS COUNTY MEDICAL SOCIETY AND TEXAS MEDICAL ASSOCIATION

By (s) Durwood E. Neal M. D.
Durwood E. Neal, M. D., President
Texas Medical Association

By (s) Joseph C. Ogle, M. D.
Joseph C. Ogle, M. D., President
Dallas County Medical Society

By (s) Richard C. Gray
Richard Gray, Jr.
THOMPSON AND KNIGHT

By (s) Donald P. Wilcox
Donald P. Wilcox, General Counsel
Texas Medical Association

By (s) Michael G. Young
Michael G. Young, Staff Attorney
Texas Medical Association