**Henri and Mary TATRO et al.,
Plaintiffs-Appellants,**

v.

**The STATE OF TEXAS et al.,
Defendants-Appellees.**

**No. 80–1069.**

United States Court of Appeals,
Fifth Circuit.

Sept. 2, 1980.

Rehearing Denied Oct. 17, 1980.

Craig T. Enoch, Dallas, Tex., for plaintiffs-appellants.

James W. Deatherage, Irving, Tex., for Irving Independent School District & Bd. of Trustees of Irving, et al.

O. Glenn Weaver, Irving, Tex., for J. F. Townley.

Martha H. Allan, Asst. Atty. Gen., Austin, Tex., for State of Texas & Texas Ed. Agency.

Before GOLDBERG, TATE, and SAM D. JOHNSON, Circuit Judges.

GOLDBERG, Circuit Judge:

Amber Tatro is a four-years-old child who suffers from myelomeningocele, a birth defect commonly known as spina bifida.[1] As a result of this congenital defect, Amber suffers from orthopedic and speech handicaps and from a neurogenic bladder. This latter condition prevents Amber from being able to empty her bladder voluntarily. As a result, Amber must be catheterized every three to four hours in order to function normally without the danger of developing chronic kidney infection.

In 1979, Amber became eligible for participation in the early childhood development program provided by defendant Irving Independent School District ("the school district"). After a series of meetings with Amber's mother, the school district's Admission, Review and Dismissal Committee developed an Individualized Education Plan ("IEP") for Amber as required by the Education for All Handicapped Children Act of 1975 ("the EAHCA"), 20 U.S.C. § 1414(a)(5).[2] The IEP stipulates that phys-

1. We caution that we recite the "facts" here only to place the case in context and that we really have no facts to speak of. Following a conference between the parties and the district court, the court invited stipulated facts. Plaintiffs submitted their proposed stipulation; defendants failed to respond. Instead of compelling such a response or making its own findings, the district court issued a memorandum opinion denying plaintiffs' motion for a preliminary injunction. Thus, we have no findings upon which to rely for our review.

Obviously, the preferable course would have been for the district court to find facts so that its disposition of plaintiffs' motion would be more fully amenable to appellate review. Nevertheless, we are not powerless on this appeal. Since the district court's denial of plaintiffs' motion for a preliminary injunction rested on its legal interpretation of the Acts under consideration, we can review the district court's legal conclusion. Furthermore, in order to provide meaningful guidance to the district court for its consideration of plaintiffs' motion on remand, we shall assume that the facts, which we detail in this opinion and base on plaintiffs' proposal, are true. On remand, of course, the district court should make the appropriate findings. If the district court finds the facts to be different from those we state, it must then determine whether these factual de-

viations are material so as to alter the conclusion we reach.

Additionally, since the district court denied plaintiffs' motion on the ground that there was no likelihood of success on the merits, we shall discuss only that factor for a preliminary injunction. On remand, the district court should consider the other relevant criteria, to-wit, the irreparable harm to plaintiffs from failure to issue the injunction, the harm to the defendant from issuance of the injunction, and the public interest. See Canal Authority v. Callaway, 489 F.2d 567 (5th Cir. 1974). For its consideration of these factors, we direct the district court's particular attention to our recent decision in Camenisch v. University of Texas, 616 F.2d 127 (5th Cir. 1980).

2. 20 U.S.C.A. § 1414(a)(5) (West 1978), provides the following:

(a) A local educational agency or an intermediate educational unit which desires to receive payments under section 1411(d) of this title for any fiscal year shall submit an application to the appropriate State educational agency. Such application shall—

(5) provide assurances that the local educational agency or intermediate educational unit will establish, or revise, whichever is appropriate, an individualized education program for each handicapped child at the beginning of each school year and will then review and, if appropriate revise, its provi-

ical and speech therapy is to be provided to Amber. However, the IEP fails to specify the provision of any services to Amber that may be necessary due to her neurogenic bladder. More particularly, the IEP fails to specify that Clean Intermittent Catheterization (CIC) will be administered to Amber during the school day.[3]

Following the fruitless pursuit of the state remedies required by the EAHCA,[4]

> sions periodically, but not less than annually . . . .
>
> An *individualized education program is* defined as
>> a written statement for each handicapped child developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of handicapped children, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.
>
> *Id.* § 1401(19).

3. CIC is a very simple procedure which can be performed within five minutes. The catheter is washed with soap and water; the urethral area is wiped clean; the catheter is introduced approximately one and one-half inches into the urethra and the bladder contents drained; the catheter is withdrawn; and the amount of urine collected is measured and noted. The procedure can be taught to anyone after a training session of approximately thirty minutes, and it need not be performed by a doctor or nurse. Currently, Amber is catheterized at home by her parents, teenage sibling, and babysitter. However, when Amber is eight or nine years-old, she will be able to perform CIC upon herself.

4. These procedures are detailed in 20 U.S.C.A. § 1415(a)–(c) (West 1978):
> (a) Any State educational agency, any *local educational agency, and any intermedi-*ate educational unit which receives assistance under this subchapter shall establish and maintain procedures in accordance with subsection (b) through subsection (e) of this section to assure that handicapped children and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies and units.

> (b)(1) The procedures required by this section shall include, but shall not be limited to—
>> (A) an opportunity for the parents or guardian of a handicapped child to examine all relevant records with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child;
>> (B) procedures to protect the rights of the child whenever the parents or guardian of the child are not known, unavailable, or the child is a ward of the State, including the *assignment of an individual (who shall not* be an employee of the State educational agency, local educational agency, or intermediate educational unit involved in the education or care of the child) to act as a surrogate for the parents or guardian;
>> (C) written prior notice to the parents or guardian of the child whenever such agency or unit—
>>> (i) proposes to initiate or change, or
>>> (ii) refuses to initiate or change,
>> the identification, evaluation, or educational placement of the child or the provision *of a free appropriate public education to* the child;
>> (D) procedures designed to assure that the notice required by clause (C) fully inform the parents or guardian, in the parents' or guardian's native language, unless it clearly is not feasible to do so, of all procedures available pursuant to this section; and
>> (E) an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such *child.*
>
> (2) Whenever a complaint has been received under paragraph (1) of this subsection, the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency or intermediate educational unit, as determined by State law or by the State educational agency. No hearing conducted pursuant to the requirements of this paragraph shall be conducted by an employee of such agency or unit involved in the *education or care of the child.*
>
> (c) If the hearing required in paragraph (2) of subsection (b) of this section is conducted

Amber's parents, plaintiffs, sued in district court in accordance with 20 U.S.C. § 1415(e)(2).[5] They contend that because the IEP contains no provision for CIC, the school district has violated the EAHCA, 20 U.S.C. § 1412(1), by failing to provide a free appropriate public education to Amber.[6] They also contend that the school district has violated section 504 of the Rehabilitation Act of 1973, ("section 504"), *as amended,* 29 U.S.C. § 794.[7] The case reaches us from the district court's denial of plaintiffs' motion for a preliminary injunction to require the school district to provide CIC.[8] For the reasons detailed below, we vacate and remand.

## I. The EAHCA

The Education for All Handicapped Children Act of 1975, 89 Stat. 773 (1975), was sparked by an "[i]ncreased awareness of the educational needs of handicapped children and landmark court decisions establishing

by a local educational agency or an intermediate educational unit, any party aggrieved by the findings and decision rendered in such a hearing may appeal to the State educational agency which shall conduct an impartial review of such hearing. The officer conducting such review shall make an independent decision upon completion of such review.

5. 20 U.S.C.A. § 1415(e)(2) (West 1978) provides the following:

Any party aggrieved by the findings and decision made under subsection (b) of this section who does not have the right to an appeal under subsection (c) of this section, and any party aggrieved by the findings and decision under subsection (c) of this section, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

6. 20 U.S.C.A. § 1412(1) (West 1978) provides that "[i]n order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Commissioner that the following conditions are met: (1) The State has in effect a policy that assures all handicapped children the right to a free appropriate public education."

Free appropriate public education is defined as

special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

*Id.* § 1401(18).

Free appropriate public education thus includes special education and related services. The Act defines special education as "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." *Id.* § 1401(16). Related services are defined as follows:

The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children.

*Id.* § 1401(17).

7. Section 504 of the Rehabilitation Act of 1973, *as amended,* 29 U.S.C.A. § 794 (West Supp. 1980), in pertinent part, provides the following:

No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

8. In its opinion denying plaintiffs' motion for a preliminary injunction, the district court also granted the motion to dismiss for lack of personal jurisdiction of defendant Townley, Superintendent of the Irving Independent School District. This ruling is not before us on this appeal.

In addition, defendants raise multifarious arguments attacking the sufficiency of plaintiffs' complaint. These issues are not before us and should be handled on remand.

the right to education for handicapped children . . . ." S.Rep.No.168, 94th Cong., 1st Sess. 5, *reprinted in* [1975] U.S.Code Cong. & Admin. News, pp. 1425, 1429. The Congress found that handicapped children were receiving inadequate services, were not being properly identified and evaluated, and were being subjected to unnecessary exclusion from the regular educational environment.[9] To remedy this situation, Congress increased educational grants to participating states to enable them to meet the unique needs of handicapped children, *see id.* at 7–9, [1975] U.S.Code Cong. & Admin. News at 1431–33, strengthened procedures to enable parents of handicapped children to advocate more forcefully the rights of their handicapped children, *see id.* at 9, [1975] U.S.Code Cong. & Admin. News at 1433, adopted judicially imposed due process requirements that ensure the proper identification and evaluation of handicapped children, *see id.* at 26–30, [1975] U.S.Code Cong. & Admin. News at 1450–52, and stipulated that handicapped children were to be integrated into the regular classrooms to the maximum extent appropriate. *See id.* at 33–34, [1975] U.S.Code Cong. & Admin. News at 1457–58; S.Conf.Rep.No.455, 94th Cong., 1st Sess. 30, *reprinted in* [1975] U.S.

Code Cong. & Admin. News, pp. 1480, 1483. In reference to the last objective, the Report stated:

> The Conferees point out that while instruction may take place in such locations as classrooms, the child's home, or hospitals and institutions, the delivery of such instruction must take place in a manner consistent with the requirements of law which provide that to the maximum extent appropriate handicapped children must be educated with children who are not handicapped, and that handicapped children should be placed in special classes, separate schooling, or any other educational environment only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and supportive services cannot be achieved satisfactorily.

*Id.*

█ To ensure the provision of proper services, Congress mandated that recipients of federal funds must assure "all handicapped children the right to a free appropriate public education," 20 U.S.C.A. § 1412(1) (West 1978), which consists of special education and related services. *See id.* § 1401(18).[10] The battle lines in this case

---

**9.** The congressional findings are contained in section 3(a) of the EAHCA:

> *The Congress finds that—*
>
> (1) there are more than eight million handicapped children in the United States today;
>
> (2) the special educational needs of such children are not being fully met;
>
> (3) more than half of the handicapped children in the United States do not receive appropriate educational services which would enable them to have full equality of opportunity;
>
> (4) one million of handicapped children in the United States are excluded entirely from the public school system and will not go through the educational process with their peers;
>
> (5) there are many handicapped children throughout the United States participating in regular school programs whose handicaps prevent them from having a successful educational experience because their handicaps are undetected;
>
> (6) *because of the lack of adequate serv-*ices within the public school system, families are often forced to find services outside the public school system, often at great distance

from their residence and at their own expense;

> (7) *developments in the training of teach-*ers and in diagnostic and instructional procedures and methods have advanced to the point that, given appropriate funding, State and local educational agencies can and will provide effective special education and related services to meet the needs of handicapped children;
>
> (8) State and local educational agencies have a responsibility to provide education for all handicapped children, but present financial resources are inadequate to meet the special educational needs of handicapped children; and
>
> (9) it is in the national interest that the Federal Government assist State and local efforts to provide programs to meet the educational needs of handicapped children in order to assure equal protection of the law.

20 U.S.C.A. § 1401 (West 1978) (historical note).

**10.** The definitions of the terms "free appropriate public education," "special education," and "related services" are reprinted at note 6 *supra.*

have been drawn on the issue whether the provision of CIC to Amber, a handicapped child within the meaning of the EAHCA, see id. § 1401(1),[11] is a related service.

◼ The district court held that CIC is not. It observed that there are only two categories of related services: (1) transportation required to assist a handicapped child to benefit from special education, and (2) developmental, corrective, and supportive services necessary to assist a handicapped to benefit from special education. It properly concluded that CIC is not transportation and that CIC is neither developmental nor corrective. The district court noted that "CIC is supportive of Amber's education in the sense that it is required at sufficiently frequent intervals that her education and CIC must proceed apace," and that "[o]ne can argue that read literally, every necessary life support system must be furnished." Nevertheless, the district court concluded that there was "no congressional intent to sweep broadly in its usage of the word 'related.'" The court thus held that "to be related in the statutory sense the service requirement must arise from the effort to educate. There is a difference between maintenance of life systems and enhancing a handicapped person's ability to learn. The CIC is essential to Amber's life but once that life maintenance service is provided, it is unrelated to her learning skills."

◼ The district court further observed that the regulations implementing the EAHCA [12] construe related services to include "school health services,"[13] which are defined as "services provided by a qualified school nurse or other qualified person." 45 C.F.R. § 121a.13(b)(10) (1979). Despite the fact that CIC comports with this definition of school health services, the district court held that school health services, to be a class of related services, must, like all categories of related services, arise from the effort to educate in order to fit within the statutory definition. Hence, CIC did not fit the bill. We find that the district court erred.

As the district court correctly observed, CIC falls within a literal interpretation of the statutory definition of related services. Quite simply put, without the provision of CIC, Amber cannot benefit from the special education to which she is entitled, for, without CIC, she cannot be present in the classroom at all. Thus, CIC is a supportive service required to assist Amber to benefit from her special education.

Nevertheless, the district court felt compelled to limit the literal words of 20 U.S.C. § 1401(17) because it perceived a need to circumscribe the scope of related services lest "every necessary life support system . . . be furnished." This perception, however, ignored the fact that the EAHCA contains its own limitations on the type of life support services that must be provided as related services. First, in order to be entitled to any related services at all, a child must be handicapped so as to require

11. 20 U.S.C.A. § 1401(1) (West 1978) provides the following:

The term "handicapped children" means mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disabilities, who by reason thereof require special education and related services.

12. These regulations are contained at 45 C.F.R. part 121a1979). They were drafted by the Office of Education of the former Department of Health Education and Welfare whose functions have since been transferred to the newly-created Department of Education. See Pub.L.No. 96–88 § 601, 93 Stat. 696 (October 17, 1979).

13. 45 C.F.R. § 121a.13(a) (1979) provides the following:

As used in this part, the term "related services" means transportation and such developmental, corrective, and other supportive services as are required to assist a handicapped child to benefit from special education, and includes speech pathology and audiology, psychological services, physical and occupational therapy, recreation, early identification and assessment of disabilities in children, counseling services, and medical services for diagnostic or evaluation purposes. The term also includes school health services, social work services in schools, and parent counseling and training.

special education. 45 C.F.R. § 121a.14 (1979) (comment one); *see* 20 U.S.C.A. § 1401(1) (reprinted at note 11 *supra* ). Second, the life support service must be necessary to aid a handicapped child to benefit from the special education to be provided. *See id.* § 1401(17). Thus, a life support service would not be a related service if it did not have to be provided during school hours, but instead could be performed at some other time.[14] Third, in order to be a related service, the life support service must be one which a nurse or other qualified person can perform. 45 C.F.R. § 121a.13(b)(10) (1979). Excluded from the term "related services" are those health-related activities which must be performed by a licensed physician that are not provided "to determine a child's medically related handicapping condition which results in the child's need for special education and related services." *Id.* § 121a.13(4).[15] Thus, even under a literal interpretation of the statutory definition, the types of life support services needed by a child which can be related services are limited.

Moreover, the district court's deviation from the literal words of the statute ignored a mandate contained in the EAHCA which is additional to the congressional requirement that states furnish each handicapped child a free appropriate public education consisting of special education and related services. The language of 20 U.S.C.A. § 1412(5) (West 1978) is quite unequivocal: [16]

In order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Commissioner that the following conditions are met:

(5) The State has established . . . procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily . . . . .

Construing the term "related services" to exclude services like CIC, necessary to keep a handicapped child in the classroom, would completely eviscerate this mandate. This we cannot do. In light of this categorical congressional judgment that handicapped children should be educated in the regular classrooms to the maximum extent appropriate, and given the existence of limitations in the statute which circumscribe the types of life support systems which must be

---

14. For example, suppose that a child required an insulin injection once a day to maintain his life. Since the injection could be administered at night after school, it would not be a supportive service required to assist the child to benefit from special education. Thus, it would not be a related service.

15. The exclusion of medical services not performed for diagnostic and evaluation purposes derives from the definition of related services. *See* 20 U.S.C.A. § 1401(17) (West 1978). Given this exclusion, HEW quite properly eliminated such health-related services from the definition of related services contained in the regulations. Concomitantly, since there is no blanket exclusion from supportive services for all health-related services, the inclusion of health-related services that are not performed by a physician and are "required to assist a handicapped child to benefit from special education," *id.*, is quite proper.

16. Equally categorical is 20 U.S.C.A. § 1414(a)(1)(C)(iv) (West 1978):

A local educational agency or an intermediate educational unit which desires to receive payments under section 1411(d) of this title for any fiscal year shall submit an application to the appropriate State educational agency. Such application shall—
(1) provide satisfactory assurance that payments under this subchapter will be used for excess costs directly attributable to programs which—
(C) establish a goal of providing full educational opportunities to all handicapped children, including—
(iv) to the maximum extent practicable and consistent with the provisions of section 1412(5)(B) of this title, the provision of special services to enable such children to participate in regular educational programs
. . . . .

provided as related services, we hold that the words "supportive services . . . as may be required to assist a handicapped child to benefit from special education" must be read literally to include the provision of CIC to Amber Tatro.[17]

## II. Section 504

The district court gave plaintiff's claim under section 504 of the Rehabilitation Act of 1973 [18] rather short shrift. The gravamen of its holding is that section 504 does not require the school district to provide CIC to Amber because "[p]laintiffs cannot convert a statute prohibiting discrimination in certain governmental programs to a statute requiring, in essence, the setting up of governmental health care for people seeking to participate in such programs." This conclusion is incorrect.

In *Camenisch v. University of Texas*, 616 F.2d 127 (5th Cir. 1980), plaintiff, a deaf graduate student at the University of Texas, brought suit against the University because of its refusal to provide him with sign language interpreter services, an aid which he claimed was necessary for his participation in the University's programs. We affirmed the district court's grant of a preliminary injunction requiring the University to provide interpreter services. We held that the failure to provide interpreter services amounted to the exclusion of plaintiff from the University's programs and hence violated section 504. *See id.* at 133.

Analogously, Amber has been excluded from the school district's programs by the district's refusal to provide CIC. Without the provision of CIC to Amber, she will be unable to participate in the preschool programs of the school district. Such exclusion is expressly condemned by section 504.

Defendants contend that *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), dictates the contrary result. This assertion is incorrect. As we observed in *Camenisch, supra*, "the Supreme Court's decision in *Southeastern Community College* says only that Section 504 does not require a school to provide services to a handicapped individual for a program for which the individual's handicap precludes him from ever realizing the principal benefits of the training." *Id.* at 133. Thus, like *Camenisch*, this case is distinguishable from *Southeastern Community College* because, with the provision of CIC, Amber will be able to perform well · in school and thus realize the principal benefits of the school district's program.[19] The

---

17. Our holding that these words should be read literally, subject only to the limitations, contained in the statute, which we have discussed, is supported by the statute's enumeration of physical and occupational therapy, and recreation as examples of related services. *See* 20 U.S.C.A. § 1401(17) (West 1978). We fail to see how these services "arise from the effort to educate" any more than CIC.

In view of our holding that CIC is a related service, we need not address the issue whether 20 U.S.C.A. § 1414(a)(1)(C)(iv) (West 1978), by its use of the term "supplementary aids and services," contemplates the provision of services additional to "related services."

18. Section 504 is reproduced at note 7 *supra*.

19. We by no means intend to intimate that every type of service, necessary to prevent the exclusion of an otherwise qualified handicapped person from a program, must be provided. First, section 504 does not require "substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals . . . ." *Southeastern Community College,*

· *supra*, 99 S.Ct. at 2369. Thus, the College was not required to eliminate certain required courses or to provide individual supervision by faculty members whenever respondent, a deaf nursing student, would attend patients directly. *See id.*, 99 S.Ct. at 2368. This result obtained because "[w]hatever benefits respondent might realize from such a course of study, she would not receive even a rough equivalent of the training a nursing program normally gives." *Id.*, 99 S.Ct. at 2369. In contrast, like the plaintiff in *Camenisch, supra*, who will receive the principal benefits of the University's program once a deaf interpreter is provided, Amber will realize the principal benefits of the school·district's program once CIC is provided.

Second, *Southeastern Community College* possibly indicates that section 504 does not require the provision of services that would impose "undue financial and administrative burdens" upon the recipient. *See Southeastern Community College, supra*, 99 S.Ct. at 2370. Thus, for example, section 504 may not require the school district to provide a very expensive procedure like kidney dialysis to a child who needs such a service during the school day.

school district's failure to provide CIC therefore violates section 504.

VACATED and REMANDED for proceedings not inconsistent with this opinion.

However, CIC does not appear to approach an undue financial and administrative burden. It can be performed in five minutes by anyone who has received thirty minutes of training.

This burden appears to be a far cry from being "undue." Of course, since we have no findings upon which to rely, see note 1 supra, we leave this determination to the district court.