Julia L. Sayles, Asst. Corp. Counsel, Washington, D.C., for plaintiff.

Michael Eig, Washington, D.C., for defendants.

**Floretta McKENZIE, Plaintiff,**

v.

**Alexandra JEFFERSON, et al., Defendants.**

**Civ. A. No. 82–2055.**

United States District Court, District of Columbia.

April 11, 1983.

## OPINION

JOHN GARRETT PENN, District Judge.

The plaintiff [1], in this action filed pursuant to the Education for All Handicapped Children Act (EAHCA), 20 U.S.C. § 1401 et seq., seeks to vacate and set aside a Determination of a Hearing Officer entered on July 18, 1982, finding that the District of Columbia Public Schools (DCPS) placement at the Lodge School, the on-grounds day school at Chestnut Lodge, a private psychiatric hospital in Rockville, Maryland, was inappropriate.

The sole issue is whether DCPS was and is required to fund only the day program for Alexandra Jefferson at Chestnut Lodge, or whether DCPS is required to fund both the educational program at the Lodge School *and* Alexandra's hospitalization at Chestnut Lodge. Defendants contend that DCPS must fund both, while plaintiff con-

---

1. The plaintiff, the superintendent of schools, brings this action on behalf of DCPS and ac- cordingly, throughout this Opinion, the Court refers to DCPS as the plaintiff.

tends that DCPS is not responsible for the residential placement at Chestnut Lodge.

This case was filed on July 23, 1982. A related case, *Intrator v. District of Columbia Board of Education,* Civil No. 82–1204, was filed on April 30, 1982. Although the defendants were not originally party plaintiffs in that case, the *Intrator* plaintiffs moved to amend their complaint on May 13, 1982 to include the Jeffersons. That motion was granted on May 27, 1982. *See Intrator* Memorandum Order filed May 27, 1982. While that case is not consolidated with this case, by agreement of counsel, the trial in each was heard on the same day.[2]

I

The facts relating to Alexandra Jefferson are as follows: She was born in Washington, D.C. on April 5, 1967, the third and youngest child in the Jefferson family. She and her family lived in Washington until 1978 when her father accepted a three-year assignment in Rome, Italy. Up to this time she had been well adjusted, sociable and an excellent student. However, in mid-1979, shortly after the family's arrival in Rome, she had feelings of grandiosity, depersonalization, and hallucinations of being Jesus. The symptoms subsided without intervention, but in the fall of 1979, she began to experience severe nightmares. At this time she was seen by her pediatrician for severe pain with no organic basis. In September 1981 she became severely depressed and withdrawn and at times believed she was the devil and at other times believed she was Jesus. Since she was evidencing psychotic behavior, she was hospitalized in Naples, Italy. She was thereafter transferred from the hospital in Naples by Medivac plane and placed in the Psychiatric Institute in Washington, D.C. Shortly thereafter, the family, feeling that she required a different type of setting, placed her at Chestnut Lodge in Rockville on October 8, 1981, where she remained as a full time resident until October 1, 1982. Jenny Jefferson Affidavit ¶ 4.

Mrs. Jefferson went to Francis Junior High School on October 15, 1981 and re-enrolled Alexandra in DCPS. She filled out a Form 205, requesting a special education placement, and specifically requested that Alexandra be placed at Chestnut Lodge. Approximately four months later, she was requested to attend an Individualized Education Program (IEP) meeting at the Logan Child Center in the District of Columbia. During this time, Alexandra was neither seen nor evaluated by DCPS representatives. The IEP meeting was held on February 2, 1982. Mrs. Jefferson did not have another opportunity to meet with DCPS representatives until March 24, 1982. When no further action was taken by DCPS, the Jeffersons requested a due process hearing which was held on April 28, 1982.

On May 11, 1982, the Hearing Officer submitted his Determination in which he found that Alexandra is a seriously emotionally disturbed child whose request for a special education program and placement submitted in October 1981 had not been acted on by DCPS. The Hearing Officer found that there had been a denial of placement and directed DCPS to make a placement recommendation no later than May 4, 1982. On May 4, the Residential Review Committee decided to place Alexandra at St. Elizabeth's Hospital. *See* Clark Letter dated May 4, 1982. Her parents were to present her on May 7, 1982, but the letter failed to state any reasons for the proposed placement. It appears that no one at DCPS had bothered to check with officials at St. Elizabeth's Hospital to determine whether this would be an appropriate placement for the child, and, in fact, when a committee representative finally contacted the hospital, she was advised that there was no program for Alexandra.

The Jeffersons were joined as party plaintiffs in the *Intrator* case and moved

---

**2.** By the time the *Intrator* case came on for trial, the Intrator plaintiffs had obtained relief and Michael Intrator had been placed in a resi-

dential placement funded by DCPS. *See Intrator* Memorandum Order filed May 27, 1982.

for a temporary restraining order which was denied. *See Intrator* Memorandum Order filed May 27, 1982. A second due process hearing was held on May 26, 1982 after DCPS proposed placement in the Chestnut Lodge day school, a placement the Jeffersons contended was inappropriate.

The issue raised at the May 1982 due process hearing, although stated to be whether placement in the day program at Chestnut Lodge was appropriate, was really whether DCPS should be required to fund Alexandra in the residential program at Chestnut Lodge. The school at Chestnut Lodge is the same, whether the placement be a day program or a residential program; the issue then is payment for the residential portion of the program. The question was and is whether, the residential placement in the hospital of Chestnut Lodge must be funded as a related service. *See* 20 U.S.C. § 1401(16), 34 C.F.R. § 300.13 (1982). The Hearing Officer determined that a day placement at Chestnut Lodge was inappropriate and that "a residential setting—room and board is an essential component to her program." He did not direct that Alexandra be placed at Chestnut Lodge; rather, he directed DCPS to submit a proposed placement in 20 days and ruled that "until such time [DCPS] shall bear the financial responsibility for [Alexandra's] placement at Chestnut Lodge." June 18, 1982 Determination at 7. It is this determination which the plaintiff now appeals.

The burden of proof in this case is on the plaintiff and DCPS, and the same holds true in the related case of *Intrator.* Clearly, the plaintiff, in attempting to vacate the decision of the hearing officer has the burden of establishing by a preponderance of the evidence that the Hearing Officer's determination should be set aside and that a day placement at the Lodge School was appropriate. 20 U.S.C. § 1416(e)(2). The burden is not changed in *Intrator* merely because the Jeffersons brought the case as plaintiffs to force DCPS to comply with the Determination of the Hearing Officer.

## II

DCPS argues that it is only required under the EAHCA to fund Alexandra's placement at the Chestnut Lodge School, hereinafter referred to as the Lodge School. The annual cost for the school, excluding related services, amounts to approximately $13,000. DCPS notes in making this concession that Alexandra requires special education and that DCPS is required to furnish that education in a classroom, where possible, and if not possible, in a home, a hospital or an institution. *See* 20 U.S.C. § 1401(16). DCPS contends that when Alexandra was placed in the Chestnut Lodge Hospital due to her mental illness, its sole responsibility was to make arrangements to continue her special education. Here, the task was easy since the Lodge School is on the grounds of Chestnut Lodge, and is a special education school.

Indeed, the Lodge School "serves those students whose primary handicap is considered 'emotionally handicapped' and those students who are considered 'learning disabled.'" *See* Lodge School letter dated January 25, 1982 and attachments thereto. DCPS also concedes that while Alexandra is a student at the Lodge School, it is required to furnish any necessary related services, as that term is defined in the statute and the regulations. This includes transportation and such medical services as are for diagnostic and evaluation purposes only. *See* 20 U.S.C. § 1401(17).

Alexandra was enrolled in the Lodge School in October 1981 and remains in the school. There has been a change in her residential placement however, since, although she resided at the Chestnut Lodge Hospital from October 1981 until October 1982, she now resides at home with her parents while attending the Lodge School. This change was made without notification to DCPS and without its consent, and without any determination by a Hearing Officer or order from the Court. While Alexandra was residing at Chestnut Lodge, the charges amounted to $209.00 per day in addition to the cost of tuition. Although she now resides at home, she still receives

treatment at the hospital component of Chestnut Lodge for which DCPS is billed $82.50 per day. DCPS argues that it should not be financially responsible for either the $209.00 per day while Alexandra was an inpatient at the hospital, or the $82.50 per day now that she is on outpatient services. The school system contends that these are not related services.

Thus, the sole issue is whether DCPS should be required to pay the inpatient and outpatient hospitalization expenses of Alexandra. Although the Jeffersons had paid a portion of those expenses, they state that they have exhausted most of their private funds and insurance funds. If such funds are exhausted, it will become necessary to remove Alexandra from the hospital component of Chestnut Lodge and perhaps place her in a public facility. The record is unclear as to whether there is a public facility available. The attempt of DCPS to place Alexandra at St. Elizabeth's hospital was obviously not carefully considered by DCPS and it is unknown to the Court whether the hospital would be able to furnish either inpatient or outpatient treatment for Alexandra. With respect to solely outpatient treatment, the Court assumes that Alexandra can be referred to any one of several public mental health clinics in the District of Columbia, but again, this apparently has not been explored by DCPS. In fact, while DCPS complains about the unilateral decision by Alexandra's parents to remove her from Chestnut Lodge Hospital and place her in the home with her parents, a decision made without the knowledge and consent of DCPS, it has offered no new program or placement for the child. This being the case, Alexandra's present placement remains the Lodge School. *See* 20 U.S.C. § 1415(e)(3); 34 C.F.R. § 300.513 (1982).

The cost to fund Alexandra as an inpatient is approximately $60,000 per year, plus other charges, which together with tuition brings the total to approximately $82,000 to $85,000 per year. The cost for outpatient services, excluding tuition and related services, is approximately $23,000 per year. DCPS is under no obligation to place and fund the child in the *best* appropriate place-

ment; its only obligation under EAHCA is to place the child in an appropriate placement.

## III

The EAHCA provides that handicapped children are to be provided with a free appropriate education. The term "handicapped children" includes mentally retarded, speech impaired, seriously emotionally disturbed, other health impaired children and children with specific learning disabilities. 20 U.S.C. § 1401(1). "Free appropriate public education" means special education and related services which are provided at public expense, under public supervision and direction, and without charge, which meet the standards of the state educational agency, and include preschool, elementary or secondary education, and are provided in conformity with the Individualized Educational Program (IEP) required by 20 U.S.C. § 1414(a)(5). 20 U.S.C. § 1401(18). The term "special education" refers to a specially designed instruction to meet the needs of a handicapped child "including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." 20 U.S.C. § 1401(16). The term "related services" means:

> Transportation, and such developmental corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children.

20 U.S.C. § 1401(17).

The issue here is really legal rather than factual. DCPS does not dispute that Alexandra should have been placed at the Chestnut Lodge Hospital; it only argues that such placement does not constitute a relat-

ed service for which it is responsible. In short, DCPS views such hospitalization and treatment as being no different than hospitalization for a physical injury.

When Alexandra was placed at Chestnut Lodge on October 9, 1981, "she was in an acute schizophrenic psychotic state which had begun two weeks earlier in Rome, Italy. [She] was transferred to the Naval Hospital in Naples in a catatonic stupor and then transferred to the Psychiatric Institute in the District of Columbia." *See* Psychiatric evaluation—Jaime Buenaventura. She was treated with Navane, but when she arrived at Chestnut Lodge she still had "delusional beliefs about good and evil" "grandiose identification with Christ and gave the impression of being hallucinative and fragmented." "Homicidal and suicidal concerns were prominent" and she suffered with "primitive rage." *Id.* She responded to "intensive staff contact" and thereafter used "less psychotic defenses", however a "marked depressed affect surfaced." *Id.* Her stay in the hospital, and indeed her outpatient treatment, relates to her treatment for the above mental illness. Moreover, the initial decision to return her from Italy, and ultimately, to place her in Chestnut Lodge, was a *medical* as opposed to an *educational* decision. Clearly, Alexandra, who had been described as a "well adjusted, sociable and excellent student" was a very sick child. She does not suffer from mental retardation, indeed she is extremely bright, and she apparently did not and does not suffer with organic brain syndrome. Apparently, her mental illness was not related to any physical condition. In short, having suffered a mental breakdown, she was not unlike other persons who might have been considered for voluntary or involuntary placement in St. Elizabeth's Hospital. She has responded to treatment so that in May 1982 she was described as "recovering from a psychotic break" but was "still brittle but nonpsychotic".

Without the above treatment, Alexandra would have been unable to participate in an educational program at the Lodge School or any place else. So much is clear from the record. No one contends that Alexandra was not sick, or that she did not require hospitalization.

### IV

Few reported cases have dealt with the present issue before this Court, and those that have are distinguishable on the facts. Nevertheless, some reference to those few cases is helpful.

In *Tatro v. Texas,* 625 F.2d 557 (5th Cir. 1980), the Court was called upon to decide whether the daily administration of Clean Intermittent Catheterization (CIC) fell within the definition of related services under the EAHCA. The trial court had answered that question in the negative. *Tatro v. Texas,* 481 F.Supp. 1224 (N.D.Tex. 1979). The District Court found that although CIC was essential to the child's life support system, that once the life maintenance service was provided, CIC was unrelated to her learning skills. 481 F.Supp. at 1227.

The Court of Appeals disagreed, and held that CIC was a related service because it was required to assist the handicapped child to benefit from a special education. The relevant facts were as follows: Amber Tatro, a four-year-old, suffered from myelomeningocele, a birth defect commonly known as spina bifida. As the result of this congenital defect, Amber suffered from orthopedic and speech handicaps and from a neurogenic bladder. This bladder condition prevented Amber from being able to empty her bladder voluntarily, meaning that she had to be catheterized every three or four hours in order to function without the possibility of developing a chronic kidney infection.[3]

---

**3.** Apparently the CIC procedure can be performed by a layman by washing a little metal tube, the catheter, inserting the catheter into the bladder to allow the urine to drain out, pulling the catheter out and wiping the region.

Of course, a layman would require proper training, and Amber, because of her age, could not perform the CIC on herself, although as she grows older she should be able to do so. 481 F.Supp. at 1226.

The trial court limited the words found in 20 U.S.C. § 1401(17), that is "related services", because "it perceived a need to circumscribe the scope of related services less 'every necessary life support system . . . be furnished'". 625 F.2d at 562. The appeals court found however that the EAHCA contains its own limitation on the type of life services to be rendered as related services. First, in order to be entitled to related services, the child must have been handicapped so as to require special education. Second, the life support service must be necessary to aid the handicapped child to benefit from the special education program. Third, in order to be a related service, the life support service must be one which a nurse or other qualified person can perform. 625 F.2d at 562–563. Then the Court noted that, "[e]xcluded from the term related services are those health-related activities which must be performed by a licensed physician that are not provided 'to determine a child's medically related handicapping condition which results in the child's need for special education and related services.'" 625 F.2d at 563.

In Amber's case, she was handicapped, and could not attend her special education classes without the CIC procedure. Therefore, the first two tests in the *Tatro* case had been met. Finally, the CIC procedure could be performed by a nurse, or a trained adult, that is by someone in the school health unit or a teacher. Thus, Amber's case fell within the guidelines set by *Tatro*. Here, Alexandra is handicapped, but unlike Amber, the primary reason for her placement at Chestnut Lodge was medical, not educational. The life support service, or the purported "related service" is not related at all; it was the reason for the placement at Chestnut Lodge. Moreover, those services required hospitalization, that is medical services, and as such do not fall within the term "related services" as set forth in the statute.

A similar issue was raised in *Tokarcik v. Forest Hills School District*, 665 F.2d 443 (3d Cir.1981). There, another child, ironically also named Amber, suffered from spina bifida and required CIC in order to attend her special education classes. Like Amber of Texas, she required CIC every four hours. Her parents argued that CIC was a related service because Amber could not remain and participate in her school without it. The school district argued however, that it was not connected with special education and it was a medical not an educational service. It also contended that CIC is not a related service because it would be necessary regardless of whether Amber was in school. 665 F.2d at 455–456.

In answering the objection raised by the school district, the Court turned to the regulations found in 34 C.F.R. § 300.13(a) which construed related services to include "school health services", which are further defined as "services provided by a qualified school nurse or other qualified person." 34 C.F.R. § 300.13(b)(10). Since the trial court found that CIC would require no more than a few minutes a day, with no or minimal expenditure of funds if performed by a part time nurses aide, the court concluded that CIC fell within the definition of related services. 665 F.2d at 456. The Court then went on to observe:

> Moreover, the regulations themselves place realistic limitations on the nature of the school health services to be provided under the EAHCA. In prescribing that a school nurse be capable of rendering the services, the drastic medical services that only a doctor can perform—and which the school authorities fear they will be asked to furnish in the future—are by definition excluded.

*Id.* See also *Hairston v. Drosick*, 423 F.Supp. 180 (S.D.W.Va.1976).

Again, for the same reasons as stated in the Court's reference to *Tatro*, *Tokarcik* is distinguishable on the facts, and neither case supports the arguments made on behalf of the Jeffersons. Amber of Pennsylvania, like her namesake from Texas, is a handicapped student who required the CIC procedure in order to attend her special education classes, and in each case, the CIC procedure could be performed by a nurse or trained layman.

Another case cited by the plaintiff is *Papacoda v. Connecticut*, 528 F.Supp. 68 (D.Conn.1981). That case came before the court on plaintiffs' motion for a preliminary injunction to require the state to pay all costs for attendance of a child at the DeSisto School, located in Stockbridge, Massachusetts, a town nestled in the beautiful Berkshire Hills of western Massachusetts. The child, Cherie, was an emotionally disturbed student whose placement grew out of emotional problems including self-destructive behavior. During the time she attended public school until the 12th grade, her academic performance was failing or near failing even though, according to standardized tests, she was of average intelligence. She left public school at the start of the 12th grade and entered an inpatient psychiatric program at Yale-New Haven Hospital.[4] She was placed at DeSisto on the advice of Yale-New Haven treatment personnel who thought she required a structured and therapeutic environment. The school board approved the placement when DeSisto School was approved as a special education facility by the state. The dispute arose over whether the school board was required to pay for the "noneducational" cost of residential placement, including room and board as well as therapy, when the primary reason for the placement was for emotional purposes rather than education.

The hearing officer in that case found that residential placement would not be necessary but for Cherie's emotional problems, therefore he concluded her only reason for being there had nothing to do with her special education program. 528 F.Supp. at 71. The court found that the decision of the hearing officer conflicted with federal law since federal law requires the state to provide special education at no cost to the parent and this includes residential placement. The Court noted that Cherie could not be educated without residential placement because a therapy program must be coordinated with the teaching program. 528 F.Supp. at 71. Significantly, the court

then noted that "[t]his case is not simply one in which the plaintiff must be placed in a facility to be treated solely for reasons of health. She must be placed in such a facility because such treatment is necessary in order to render her educable." *Id.*

The issue in *Papacoda* was one of residential placement, and it seems that if the argument made by the state had been accepted, there would be little if any chance, of ever requiring the state to fund a residential placement or find that a residential placement represented an appropriate program and placement under the EAHCA. Yet it is clear that under the appropriate circumstances, the State, the hearing officer, or the court may order a residential placement for special education purposes. *See* 34 C.F.R. § 300.302. The issue in the instant case however is not whether DCPS can be required to place the child in a residential placement, or even whether Alexandra required 24 hour care; rather, it is whether, under the circumstances of this case, where a child is placed in a hospital for medical reasons, such placement constitutes a related service as defined in the EAHCA and the regulations promulgated thereunder. That issue was not addressed in *Papacoda* and thus the cases are distinguishable.

The defendants also cite the Court to *North v. District of Columbia Board of Education*, 471 F.Supp. 136 (D.D.C.1979), but that case is also distinguishable on its facts. The plaintiffs in that case were attempting to find a residential placement for a child who had been discharged from a prior residential placement. DCPS in an attempt to avoid its responsibility under the EAHCA, argued that it was only responsible for the educational program, and that if the child required a residential placement for his emotional wellbeing, it was the responsibility of the Department of Human Resources (DHS), not DCPS. The Court found however that the emotional needs of the child were clearly interwoven with his education-

---

**4.** It is not known who paid the cost of the hospitalization since that was not an issue in the case.

al needs and it noted that DCPS and DHS were trying to shift the responsibility to each other. The court found that the child required a residential placement and ordered such a placement. The court noted the difficulty in drawing the distinction between the needs for residential placement due to the child's emotional state or due to the requirement for education. Again, the issue in *North* is distinguishable from that raised here. In *North,* DCPS like the state in *Papacoda,* disavowed its responsibility for making *any* residential placement. That is not the issue here.

None of the cases cited by the parties addressed the precise issue raised in this case.

## V

A clear answer cannot be found in EAHCA or its regulations, although a reading of both supports the argument that the cost of hospitalization does not fall within the definition of "related services."

If DCPS is required to pay for Alexandra's hospitalization, it would be required to do so only because such hospitalization is a related service. This Court can find no other section of EAHCA which would provide for such payment. Clearly, the term "special education" refers to "specially designed instruction". It refers to education as that term is commonly understood. Even though instruction may be at home, or in institution, or in hospital, the key word is instruction as it relates to education. *See* 20 U.S.C. § 1401(16). The reference to hospital means no more than that under certain circumstances where hospitalization of a handicapped child is necessary, the state may be required to provide instruction at or near the hospital. But payment for Alexandra's hospitalization cannot be made under "special education." Thus, since payment is not required as special education, it must be required, if at all, as a "related service", *see* 20 U.S.C. § 1401(17), for "free appropriate public education" means "special education and related services." *See* 20 U.S.C. § 1401(18).

"Related services" refers to a variety of services and the statutory definition is clearly not all inclusive. The statute identifies some related services as transportation, recreation, physical and occupational therapy, speech pathology and audiology. Where a child is handicapped and cannot walk to a special education class because the classes are too far away, or because he is emotionally unable to make the trip, or because he has a physical impairment making it an impossible trip for him, he is entitled to transportation. He requires the transportation as a related service to enable him to take advantage of and to benefit from his special education program. His parents are not required to transport him; the school board is required to do so under the EAHCA. The rendering of the related services supports the special education program. The same can be said for the other services specifically included in the definition of related services. An excellent example of such a service is the CIC procedure described in *Tatro* and *Tokarcik,* the two Ambers.

More at issue in this case is the definition of related services as including "medical services", but the EAHCA contains an important limitation on medical services, a limitation not found elsewhere in Section 1401. Medical services included within the term "related services" are those that are for "diagnostic and evaluation purposes *only.*" 20 U.S.C. § 1401(17) (emphasis the Court's). The term does not include treatment, and especially not medical treatment rendered over lengthy periods of time as here. "Medical services" are defined in the regulations to include "services provided by a licensed physician to determine a child's medically related handicapping condition which results in the child's need for special education and related services." 34 C.F.R. § 300.13(b)(4). Again, these were not the services rendered in this case; here the hospitalization had little or nothing to do with special education. Alexandra was hospitalized so that she could receive much needed *medical* treatment.

Nowhere in the statute is there anything which would require DCPS to pay for Alexandra's hospitalization. The limitation on

medical services is referred to in both *Tatro* and *Tokarcik* but that limitation did not affect the outcome of those cases because neither child required a licensed physician to do the CIC. Moreover, in both cases the child was in a special education placement and merely required the CIC to continue in the placement. The procedure was relatively inexpensive, required only a few minutes, and could be performed by a nurse, nurse's aide or layman trained in its operation and use. Indeed, an adult or older child could perform the procedure on herself.

## VI

The Court is not unmindful of the pain and the anxiety that the Jeffersons must have suffered when Alexandra had a breakdown. All of these cases evoke a great deal of sympathy, and as Judge Higginbotham observed in *Tatro v. Texas,* 481 F.Supp. at 1226, such cases "tug[ ] at the heart strings." Certainly, the fall of 1981, and the following year must have been very difficult for this family due to the concern over the mental health of a daughter who had shown such promise, the desire to provide her with the best care possible, and the anxiety over how ever increasing bills could be paid. But the Court must be guided by the law and legal precedent and not by emotion.

After carefully considering all of the relevant facts in this case, and the applicable law, the Court concludes that DCPS is not financially responsible for Alexandra's hospitalization at Chestnut Lodge. When she was placed in that facility it was for medical reasons, as opposed to educational reasons. It was simply not a case of a special educational placement. This notwithstanding the fact that within a few days after placing Alexandra at Chestnut Lodge the parents submitted a request for a special educational program and placement at Chestnut Lodge. At that time Alexandra was seriously ill, mentally ill, and required immediate hospitalization. She remained in the hospital for primarily medical reasons although she began to participate in a special educational program at the Lodge School. DCPS is financially responsible for Alexandra's attendance at the Lodge School and for any "related services" to that placement, but it is not financially responsible for her hospitalization.

The hospital component of Chestnut Lodge did not and does not represent a special education placement since such placement is made for medical as opposed to educational reasons.

Even if the Court were to conclude that the parents placed Alexandra at the hospital for what they felt were special education reasons, it remains that the placement at the hospital is and was not a related service as that term is defined in 20 U.S.C. § 1401(17) and 34 C.F.R. § 300.13. This is so for three reasons. First, the primary reason for the placement was medical, the child was suffering from a serious and severe illness. Second, the placement was not made in support of a special education program for Alexandra. Third, and perhaps most important, medical services, except to the extent that they are required for diagnostic and evaluation purposes *only* are not related services. What Alexandra received when she was placed at Chestnut Lodge was hospitalization. Although the term "handicapped children" includes children who are schizophrenic, for the reasons just stated, Alexandra's hospitalization was not covered by EAHCA.

Congress could have expanded on the definition of related services to include the facts in this case but did not do so. While they included some medical services, they carefully circumscribed those services by defining related services to include only limited medical services required for "diagnostic and evaluation purposes only." If Congress had expanded on the definition to include the type of hospitalization received by Alexandra, the definition would have allowed every child who suffers from a mental illness, including all those who may be at St. Elizabeth's Hospital and similar institutions, to have their programs paid for by state educational institutions. Clearly, that was not the intention of Congress.

Defendants argue that there is a relationship between Alexandra's mental illness and the hospitalization and that therefore this is a part of her special education program. If she had not been medically treated, she would have been unable to take advantage of and receive the benefit of her special education, but the same would apply to any illness. A handicapped child who is struck by an automobile or who suffers a severe fall, or who suffers a heart seizure or stroke, may require medical treatment before he can benefit from a special education course, but the state is not responsible for such treatment. Of course, the accident or illness may cause a handicap which had not previously existed, and insofar as that handicap is concerned, the child would be entitled to the benefits of the EAHCA, but that does not address the question here.

The few courts which have dealt with this question have had to concern themselves with the limitations on life support systems required to be provided under the EAHCA. This Court agrees with the courts in *Tatro* and *Tokarcik* that those limitations are set forth in the EAHCA itself. Having reached this conclusion based upon the above facts as found by the Court, the Court concludes that DCPS is not financially responsible for Alexandra's inpatient or outpatient hospitalization at Chestnut Lodge. DCPS is of course financially responsible for any related services as defined in the statute while Alexandra attends the Lodge School.

DCPS is entitled to reimbursement for the costs of hospitalization, both inpatient and outpatient except to the extent relieved from payment by the Court.[5]

---

5. At one point in this case, the Court granted a continuance to the agency with the understanding that the agency would be financially responsible for that period.